[Nos. A075279, A074965. First Dist., Div. Two. Dec. 3, 1998.]

JOHNETTE MARIE ADAMS et al., Plaintiffs and Respondents, v. CITY OF FREMONT et al., Defendants and Appellants.

JOHNETTE MARIE ADAMS et al., Plaintiffs and Appellants, v. CITY OF FREMONT et al., Defendants and Respondents.

## COUNSEL

Farmer & Murphy, George Edson Murphy, Frank J. Torrano, Lepper, Schaefer & Harrington, Gary M. Lepper and Edward N. Schaefer for Defendants and Appellants and for Defendants and Respondents.

DeGoff and Sherman, Victoria J. DeGoff, Richard Sherman, Gwilliam, Ivary, Chiosso, Cavalli & Brewer, J. Gary Gwilliam and James Chiosso for Plaintiffs and Respondents and for Plaintiffs and Appellants.

OPINION

RUVOLO, J.—

I.

INTRODUCTION

Appellants City of Fremont and Fremont Police Sergeant Steven Osawa appeal from a jury verdict awarding Patrick Adams's surviving spouse and stepdaughter approximately $4 million in this action for wrongful death and negligent infliction of emotional distress. The jury found that City of Fremont police officers negligently handled an emergency situation in which Patrick[1] was fatally injured after threatening to commit suicide and refusing to surrender his loaded firearm to police officers.[2] Appellants contend the verdict must be reversed as a matter of law on two major grounds: (1) appellants owed no legal duty of care to Patrick or his family; and (2) appellants were immune from liability under Government Code section 820.2.[3] Appellants also contend the jury's findings were not supported by substantial evidence and that respondents were not entitled to damages for negligent infliction of emotional distress under a "bystander" theory as a matter of law.

We hold that police officers responding to a crisis involving a person threatening suicide with a loaded firearm have no legal duty under tort law that would expose them to liability if their conduct fails to prevent the threatened suicide from being carried out. The judgment of the trial court is reversed and the trial court is directed to enter a judgment in favor of appellants.

---

[1]We refer to the members of the Adams family by their first names where it is necessary to distinguish them from one another only to avoid confusion and to assist the reader. No disrespect for the parties should be inferred from such usage. For further clarity, we make collective reference throughout this opinion to the City of Fremont and Sergeant Osawa as appellants, and to Johnette Marie Adams and Gina Fannucchi as respondents.

[2]The City of Fremont was held responsible for the negligence of its employees under the doctrine of respondeat superior. (See Gov. Code, § 815.2 subd. (a).)

[3]All further undesignated statutory references are to the Government Code.

## II.

### BACKGROUND

In August 1994, the Estate of Patrick Adams, the decedent's surviving spouse, Johnette Marie Adams, and the decedent's stepdaughter, Gina Fanucchi[4] (respondents) filed a complaint against the City of Fremont and numerous police officers alleging causes of action for negligence, wrongful death and various intentional torts stemming from the events leading up to Patrick's death. Respondents later amended their complaint to name the City of Fremont and Fremont Police Sergeant Osawa as the sole defendants.

During the four-week trial of respondents' claims, evidence was introduced to support the following facts. Patrick was employed as a nurse at Washington Hospital. He was married to Johnette Marie Adams. Johnette had an adult daughter, Gina, from a previous marriage. Patrick helped raise Gina, and Gina regarded Patrick as her parent.

Patrick periodically went through periods of depression in which he would withdraw and isolate himself. Patrick told Johnette he had been suicidal in the past. Johnette described Patrick as unable to "handle alcohol." When Patrick drank hard liquor, "his behavior would change dramatically." He would become "belligerent" and "argumentative."

Patrick owned a 12-gauge shotgun and a 9-millimeter Beretta handgun. In 1988, Johnette called the police for assistance after Patrick drank too much hard liquor and slapped her in the face. After the police departed, Johnette hid Patrick's firearms in the garage because she knew he had been drinking and was depressed. At some point following the 1988 incident, the firearms were returned to the house.

On April 19, 1993, Patrick, Johnette, Gina, and Gina's fiancé, Robert Gholston, attended a family dinner at Johnette's father's house. The purpose of the dinner was to introduce the family to the new girlfriend of Johnette's father. The dinner was tense and uncomfortable. Patrick drank at least two beers and some hard liquor. He became aggressive and argumentative. Gina and Robert drove Patrick and Johnette home at approximately 9:00 p.m.

Once they arrived at their home, Johnette and Patrick argued over Patrick's drinking. Patrick acted like he was "out of control." He broke dishes and swept items off the counter with his hands. Johnette pushed Patrick. Patrick pushed her back, causing her to fall to the floor. Johnette

---

[4]By the time of trial, Gina Fanucchi had married and changed her name to Gina Gholston.

telephoned Gina and asked Gina to pick her up so she could stay at Gina's house. After the telephone call, Patrick grabbed Johnette's hand and led her to the door stating, "You can wait for Gina outside."

Gina and Robert arrived to pick up Johnette at approximately 10:45 p.m. As they started to drive away, Gina became concerned that Patrick might try to drive his van while intoxicated. She asked Robert to return to the house. Robert then tried to speak with Patrick. When he returned to the car, Robert told Johnette and Gina, "We can't leave. . . . I think he's got the gun because he had his hand behind his back when he answered the door."

After discussing the situation, Johnette, Gina, and Robert drove to the corner store and called Patrick on a pay phone. Patrick did not answer. They returned to the residence and walked through the house, calling Patrick's name. Gina saw broken glass, objects on the floor, a shelf broken off the wall, and overturned furniture. Eventually, Johnette found Patrick sitting on a clothes hamper in the dark master bedroom closet. Gina entered the bedroom and asked Patrick, "What's the matter?" and "What's wrong?" Patrick replied, "Just go away. Just leave me alone." When Gina continued to initiate conversation, Patrick discharged a firearm. Gina and Johnette heard the gunshot, but could not see in what direction the gun was pointed when it was fired.

Gina, Johnette, and Robert ran out of the house. Gina testified she did not believe Patrick had fired the gun at her, but was concerned that he might have shot himself. Johnette testified that her first reaction was that Patrick had shot himself. She pulled Gina out of the house because she "didn't want Gina to see that, . . ."

Gina went to a neighbor's house and dialed 911 for assistance. At her mother's insistence, however, Gina hung up before reporting the incident. After further discussion, they decided to telephone the police from a corner store. On their way, they saw two police cars heading toward the Adams's residence. The police dispatcher had traced Gina's 911 call and sent Fremont Police Officers Kevin Moran and Gregory Pipp to the scene. Officer Pipp arrived at 11:01 p.m., and Officer Moran arrived approximately five minutes later.

Johnette testified that she approached Officer Moran and told him her husband had been drinking, he was distraught, he had fired a shot in the

house, and he might have wounded himself.[5] Several other officers arrived to assist at the scene. The dispatcher telephoned the residence several times, but no one answered.

At approximately 11:14 p.m., Sergeant Steven Osawa responded to a radio dispatch describing "a possible suicide with the use of a handgun or attempted suicide with a handgun." When he arrived at the Adams's residence, he assumed the position of "supervisor in charge" for the duration of the evening. Sergeant Osawa had extensive experience and training in the "Special Services Unit," or "SWAT." He had attended basic hostage negotiations school three to four years earlier, but did not consider himself a specialist in the field of negotiations.

Officers Moran and Pipp relayed the information provided by the family to Sergeant Osawa.[6] Sergeant Osawa requested additional police units and the assistance of a trained negotiator, Officer Sheila Tajima-Shadle. Paramedics and an ambulance were stationed in locations approximately 150 yards away from the residence.

Approximately 15 minutes after Sergeant Osawa's arrival, he decided the police should enter the house for 3 reasons: (1) Patrick might be wounded and in need of medical care; (2) if Patrick was not wounded, to determine his location and the location of the gun Patrick had previously fired in the house; and (3) to disarm Patrick.

Sergeant Osawa sent Officer Moran to find out from the family what guns Patrick had access to and what Patrick's attitudes were toward the police. Sergeant Osawa received the information that Patrick had access to a Beretta 9-millimeter handgun and a 12-gauge shotgun, that he did not particularly like the police, and that he was unlikely to "take [the police officers] on."

Sergeant Osawa testified that he was concerned about the possibility that Patrick would react aggressively or fire on the officers in an attempt to commit "suicide by cop." He took measures to ensure that there were a sufficient number of officers with "superior firepower" at the scene to respond to such possibilities. Sergeant Osawa searched the house with the assistance of three other armed officers. The officers were heavily armed and their weapons were drawn. Sergeant Osawa periodically called out to

---

[5]Officer Moran testified that Gina told him Patrick had been drinking heavily, Patrick and Johnette had fought earlier in the evening, and that Patrick had gone into the master bedroom closet. Gina repeatedly asked Patrick to come out and talk things over, but Patrick refused. Finally, Gina exited the house after she heard a gunshot originating from the closet area.

[6]Officer Osawa testified inconsistently about whether he recalled Officer Moran's providing him with the information that Patrick had been drinking.

Patrick, identifying himself as a member of the Fremont Police Department and asking Patrick to come out. Patrick did not respond. The officers found an expended 9-millimeter shell in the master bedroom closet and a live round on the bathroom vanity.

Upon entering the backyard, Osawa again identified himself and called for Patrick to come out with his hands up. Patrick did not respond. Osawa repeated this admonition. There was still no response from Patrick. Finally, Officer Moran found Patrick in the backyard, partially concealed by a large bush. The officers turned a picnic table on its side and kneeled behind it for cover. Sergeant Osawa and Officer Pipp spoke to Patrick for approximately five minutes. Officer Pipp was not a trained specialist in negotiations. The officers called Patrick's name, asked him if he was "okay," and asked him to come out with his hands out and visible. Patrick did not respond.

Sergeant Osawa testified that this lack of response led him to believe Patrick might be wounded. He decided to use a police dog named "Gus" to get a reaction or response from Patrick so the police would know whether Patrick was alive.[7] He testified that he did not send Officer Tajima-Shadle to accomplish this task because he was concerned that Patrick was armed and might attempt to "engage" her. Gus's handler was Officer Mazzone. As he ran to his car to get Gus, Officer Mazzone saw Officer Tajima-Shadle gathering background information from the family.[8] Officer Tajima-Shadle asked whether she was needed in the backyard, and Officer Mazzone replied "no" or "not yet." After receiving the proper authorization, Sergeant Holm, the canine coordinator, and Officer Mazzone brought Gus onto the scene.

Sergeant Osawa and Officer Mazzone called out several warnings to Patrick, advising him that they were going to send in a dog if Patrick did not come out. When Patrick remained mute, Mazzone gave Gus a search command. Gus went into the bushes followed by Officers Mazzone and Moran, who had their weapons drawn. As they approached the bushes, the officers observed Patrick sitting on the ground, cradling a gun with both hands, pointed at his own chest. Patrick appeared to be wearing only underpants.

---

[7] This testimony was contradicted by an inconsistent statement previously given to an internal investigator that the dog was used in order to "flush" Patrick out of the bushes or get some reaction from him.

[8] Officer Tajima-Shadle had arrived shortly after the officers began their search of the house. Upon her arrival, she learned the following facts by interviewing the family members. Patrick had been drinking heavily that night, was suicidal, and had fired a shot in the house. The family was concerned he might have injured himself. Patrick had asked to be left alone, and this was consistent with his usual manner of dealing with depression. Patrick had thought about suicide before, but had never made an attempt or done anything like this. Patrick was a nurse at Washington Hospital and would not want to go to the psychiatric ward there.

Officer Mazzone crouched, brought his gun up and told Patrick to "Freeze" and "Drop the gun." Gus became excited and started barking and wagging his tail. Officer Mazzone gave Gus the command to stop and Gus obeyed.

Patrick told the officers to "Get the fucking dog away from me," and asked "What are you going to do, fucking shoot me?" His speech was slurred. The officers returned to their location behind the picnic table.

The Adams's yard was enclosed and the portion behind Patrick was fenced. Patrolman Lopes was stationed on the other side of the fence in case Patrick tried to leave the yard. Additional officers were stationed in front and inside of the residence.

After Patrick reacted to Gus, Officer Mazzone radioed for the negotiator, Officer Tajima-Shadle, to come to the backyard. Before Officer Tajima-Shadle reached the backyard, Officer Pipp spoke to Patrick while his shotgun was pointed in Patrick's direction.

Officer Pipp testified that he asked Patrick different questions in an effort to establish a rapport, to find out what happened, whether he was injured, and how the incident could be resolved. He asked Patrick a variety of questions, such as "Are you okay? Are you shot? Do you need help? What do you want from this? What can we do? How can we work this out?" Patrick replied with short, terse sentences, repeatedly indicating that he wanted the police to leave.[9]

At various points during their interactions with Patrick, Sergeant Osawa and Officer Pipp directed Patrick to surrender his weapon. Patrick consistently refused to comply with this direction. Sergeant Osawa testified that if Patrick had surrendered his weapon, and nearby paramedics determined that Patrick was a danger to himself or others, he would have involuntarily committed Patrick to an inpatient psychiatric facility under section 5150 of the Welfare and Institutions Code.

Sergeant Angel and Sergeant Holm took up positions at a bedroom window overlooking the yard with their guns drawn. They could see Patrick and the gun he was holding to his chest.

At 12:07 a.m., Officer Tajima-Shadle entered the backyard and attempted to negotiate with Patrick. She called out his name. Patrick mistook her for

---

[9]Officer Pipp testified the majority of Patrick's responses were statements such as "Fuck you. Fuck off. Get the fuck out of here." Sergeant Osawa testified Patrick responded with statements such as "Leave me alone" and "Go away."

Gina and told her to leave in an angry voice. Officer Tajima-Shadle explained that she was Sheila with the Fremont Police Department, not Gina. Patrick replied "Get her the fuck out of here" and became extremely angry and upset.

After negotiations with Officer Tajima-Shadle failed and Patrick's level of agitation increased, Sergeant Osawa testified that he directed Patrolman Lopes to leave his position and evacuate the neighbors because they were at risk of being injured in potential crossfire. Officer Tajima-Shadle moved near Officer Pipp to guide him in communicating with Patrick. She relayed background information to him about Patrick; however, she did not caution Officer Pipp to refrain from any suggestion that Patrick should be transported to Washington Hospital.

Officer Pipp resumed his attempts to communicate with Patrick. Officer Pipp testified that he made statements such as "we can work this out; ask[ing] him to throw the gun out; we don't have to go anywhere; we can sit there if the gun is thrown out; just talk, there's no rush." At one point, he suggested Patrick could be taken to Washington Hospital for assistance.

When Officer Pipp told Patrick the police were not there to hurt him, Patrick replied that he did not intend to hurt the police either. Patrick continually told the officers to leave. Officer Pipp responded they could not leave because that would not be "doing their job." Finally, Officer Pipp, Sergeant Osawa, Officer Tajima-Shadle, Officer Mazzone, and Officer Moran all testified that Patrick told the officers "I can make you leave" or "I can do something to make you leave." This statement was followed by gunfire originating from the bush area. At this point in time, a total of eight armed police officers were either in the Adams's backyard or at the window facing Patrick. Believing Patrick had fired at them, the officers fired at Patrick.[10] These shots occurred at 12:10 a.m., approximately one hour and nine minutes after the first police officer arrived on the scene. After the shooting, police officers retrieved Patrick's gun and pulled him out of the bushes.

---

[10]Before Patrolman Lopes left the neighbor's yard, he placed a voice-activated microcassette tape recorder on the ground five or six feet from the fence to record the events "for posterity." Respondents introduced the 54-second tape into evidence. A dog is heard barking at the beginning of the recording. Almost immediately before the shooting, the police shout orders including "Drop the gun sir" and "grab him." (Officer Mazzone testified by stipulation that the command "grab him" was directed at Gus.) Shortly after the gunfire, a male voice says ". . . want to talk to you right away." A neighbor testified that two to ten seconds before the gunfire, she heard someone yelling statements like "throw the gun down, throw the gun down." Based on this evidence and the officers' prior inconsistent statements, respondents disputed the officers' testimony that they questioned Patrick calmly, and that Patrick said "I can make you leave" or "I can do something to make you leave" immediately before the first shot was fired.

Paramedics attended to Patrick[11] and he was taken to Washington Hospital, where he was pronounced dead at 12:37 a.m.

Patrick suffered from numerous bullet wounds, including a self-inflicted wound that had penetrated his heart and liver. On direct examination, Dr. Sharon Van Meter testified that an individual suffering from Patrick's self-inflicted chest wound "might well not survive for fifteen minutes." On cross-examination, she clarified that an individual suffering from such a wound will bleed "very seriously. So he might live five minutes, he might lapse into a coma and live a little bit longer, but certainly five--ten minutes probably max[imum]." While Dr. Van Meter could not "say absolutely" that Patrick would not have survived longer than 10 minutes, she testified that "it could be eleven, but it would be unlikely that he would live say half an hour without medical treatment." When asked whether he could have lived as long as half an hour, she replied, "No, I think it's unlikely that he would."

Johnette and Gina were standing approximately 60 yards from the Adams's backyard while the police were negotiating with Patrick and at the time the guns were fired. When Johnette learned Patrick had been discovered in the backyard, she tried to run to him. A police officer restrained her.

From their location, Johnette and Gina heard the gunfire. They could not, however, see what was taking place in the backyard. Gina testified that she "knew" Patrick had been shot because "I just—I figured that many police officers in there with one man I just knew that it was him, . . ." Johnette testified she felt very strongly that Patrick had been shot. Gina and Johnette observed paramedics emerge from the house with a covered body on a gurney. They assumed it was Patrick on the gurney, but acknowledged that they could not see his face.

At trial, the question whether the responding police officers' conduct fell below the standard of care was the subject of sharply divided expert testimony. Peter Reedy, a retired police sergeant who taught classes in crisis management, testified on behalf of respondents. He explained that the proper use of time is an important calming factor in crisis management because "[t]ime is on [the police's] side." He emphasized that simply waiting and not doing anything can often be the most appropriate approach because the longer the situation goes on, the less volatile it will become. Reedy testified that the officers' response to this situation was too rushed, as evidenced by the eruption of gunfire 16 minutes after they located Patrick in the backyard.

---

[11]Entries in the police dispatch log showed a five-minute delay between the time of the shooting and the time paramedics were directed to enter the backyard and provide medical assistance to Patrick.

Reedy also described a guideline for crisis management called the "five Cs," or "containment, control, confirm[ation], calm, and communicat[ion]." He opined that the responding officers violated this guideline in a variety of ways. Once the officers properly contained the situation by setting up a police perimeter to prevent Patrick from escaping, Reedy testified they should have "backed off," left the backyard, and then tried to "talk and negotiate and find out how Pat[rick] was and what would help him to calmly handle the situation."

Reedy concluded that Sergeant Osawa did not control the situation adequately by providing the officers with proper supervision at the scene. In Reedy's opinion, Sergeant Osawa should have directed the officers from a central command post situated away from the "action," and controlled the officers in order to decrease tension and restore calm. In this case, both the control and the calm principles were violated when armed officers yelled, shined flashlights, and used a police dog in close proximity to Patrick. These actions raised the level of anxiety surrounding the scene.

Reedy testified the officers violated the principle of confirmation by failing to gather sufficient information about Patrick and the events leading up to his threatened suicide. Reedy also believed that the officers failed to communicate with Patrick in an appropriate manner. Ideally, negotiations should be conducted in a calm manner, one-on-one, and in private if possible. Reedy opined that this standard was violated when untrained officers issued confrontational commands. Reedy concluded that by the time Officer Tajima-Shadle was brought to the backyard, even the best negotiator could not have talked to Patrick because the level of anxiety at the scene was too high.

In addition to the "five Cs," Reedy testified that police standards require officers responding to a threatened suicide to protect the safety of the suicidal person by refraining from taking actions that might raise his or her anxiety levels. Instead, officers are supposed to calm the suicidal individual through talking, empathy, and understanding. Reedy concluded that this standard was violated when the officers yelled, used guns, got close to Patrick, and employed a police dog instead of a negotiator.

Reedy also testified that deadly force should never be used without first attempting "lesser degree" responses such as pulling back, getting a negotiator, and talking and showing empathy. Reedy opined that this force standard was also violated, explaining "If you lock yourself in by all these officers real close with their weapons, if you lock yourself into that, you leave yourself no alternative."

· Reedy buttressed his conclusions by quoting portions of "City of Fremont training bulletin 9110" dated July 1991 (the Bulletin) entitled "Guide for First Responders to Hostage Situations" that referred to suicide by the hostage taker. Although Patrick had taken no hostages, Reedy testified the Bulletin set forth applicable standards for police conduct in situations involving crisis intervention, critical incident management, and threatened suicides. The Bulletin instructed officers to "[a]void giving orders that may escalate the confrontation" and informed officers that "[y]our efforts should be directed toward decreasing anxiety and tension." The Bulletin also apparently referred to the time standard when it advised officers to ". . . allow the subject to speak further. If he is talking, you are gaining time." Reedy opined that the procedures set forth in the Bulletin were not followed in this case.

Respondents also introduced the expert testimony of psychiatrist Dr. Robert E. Litman, who described himself as an expert on "suicidology."[12] Dr. Litman testified that "all suicides have multiple and complex causes but the police were a major cause, a substantial cause [of Patrick's suicide.]" Dr. Litman based his conclusion on the following reasons: (1) Patrick was alone with a gun for more than an hour but he did not use it to commit suicide; (2) Patrick had no underlying motive for committing suicide; (3) previous episodes of drinking and depression had "de-escalated" and Patrick had "sle[pt] it off"; (4) approximately 95 percent of suicides occur when those people are alone, while less than 5 percent of suicides are committed in the presence of others; and (5) suicides committed in the presence of others occur "nearly always when the other people provoke it." Dr. Litman also testified that Patrick's suicide had additional causes such as his drinking, his possession of a gun and his history of considering suicide as an option.

In Dr. Litman's opinion, the best approach would have been to send Patrick's best friend, Alan Kirshner, unarmed into the backyard to speak quietly with Patrick. He acknowledged that this approach included a risk that Patrick would have shot Kirshner, but concluded that "there would have been a reasonable probability that he would not." Dr. Litman also testified that this approach included a risk that Patrick would have shot himself if Mr. Kirshner approached him, but opined that "[Patrick] would not" and characterized the risk as "reasonable." If Mr. Kirshner was not available, Dr. Litman testified that he would have waited a while, and then would possibly have tried sending Officer Tajima-Shadle alone and unarmed to the backyard to attempt further negotiations.

Appellants contested the testimony of respondents' experts through the testimony of experts Joseph Callahan and Dr. Donald Lunde. Joseph Callahan, a law enforcement consultant and trainer, testified that the conduct of

---

[12]According to Dr. Litman, suicidology is not a recognized subspecialty within psychiatry; however, it is "part of what any psychiatrist ought to know."

the responding officers did not fall below the standard of care. He explained that the officers were responding to a high-risk situation because Patrick not only possessed a gun, but had recently fired it. This scenario implicated compelling safety issues such as the safety of the officers, Patrick, and the surrounding community.

In Callahan's opinion, the armed search of Patrick's residence and back-yard was necessary and appropriate. The officers properly conducted this search with their weapons drawn to enable them to protect themselves and others and "repel any type of assault that they might reasonably expect under these conditions including the notion [that] a person may force a fire fight for the purpose of . . . committing suicide." He explained that suicidal people present a significant threat to police officers because incidents regularly occur in which the police are engaged in order to commit "suicide by cop."

In Callahan's opinion, the officers' top priority was to "isolate and contain" Patrick, and they employed proper tactics to accomplish this goal. Negotiations were secondary, and could not have even taken place without first "put[ting] a cap" on the situation through isolation and containment of Patrick.

Callahan did not agree that the officers should have retreated after locating Patrick because any repositioning of the officers increased their vulnerability to aggressive gunfire. Additionally, the officers' close proximity to Patrick offered strategic advantages. In the event Patrick separated himself from the gun, the officers would have been able to move swiftly to physically prevent Patrick from retrieving his weapon.

Callahan opined that the officers' use of the police dog was proper "because the dog offers . . . a non-lethal force option to probe the condition of [a] subject. It may get a response that helps [officers] solve the problem." He did not agree that too many officers were employed at the scene, nor did he feel that the officers' insistence on Patrick's surrendering his weapon was improper. Instead, Callahan testified that the officers' demands that Patrick put down the gun were consistent with good police practice. He explained that "[t]he gun is the problem. If we can get the gun put down and more importantly, if we can separate the gun from the subject, we can go from a high-risk operation down to something that's got moderate risk."

Callahan also testified that waiting to summon Officer Tajima-Shadle until Patrick was communicative was consistent with good police practice. He explained that "If you're not having a dialogue, then the negotiator is

useless. It's just more noise. It doesn't mean anything is happening. It's just somebody else talking. I'd save it [for] where I believe it would be most effective." In sum, Callahan opined that the responding officers acted in a manner that was consistent with "good police practice" throughout the incident.

Appellants also presented the expert testimony of psychiatrist Dr. Donald Lunde. Dr. Lunde disagreed with Dr. Litman's testimony that the police were a major or significant cause of Patrick's suicide. In his opinion, Patrick presented virtually all of the recognized suicide risk factors, including Patrick's age and gender, his previous episodes of depression and talk of suicide, his refusal to get professional help for depression, his intoxication, and his possession and recent use of a firearm. Dr. Lunde referred to Patrick as "a time bomb waiting to go off." He testified that given "all the major and substantial risk factors that contributed to [Patrick's] suicide that night . . . there simply isn't room logically for some other substantial or major factor."

On March 25, 1996, after the defense rested their case, the court granted appellants' motion for nonsuit and/or directed verdict as to certain causes of action, and denied it as to others. The court dismissed all of respondents' claims with the exception of Johnette's cause of action for wrongful death, and Johnette and Gina's causes of action for negligent infliction of emotional distress as bystanders to the shooting. However, the court rejected appellants' contention that a nonsuit or directed verdict should be granted as to the remaining causes of action on the grounds that: (1) appellants owed no legal "duty" of care to Patrick or his family; and (2) appellants were immune from civil liability for their acts under section 820.2.

At the hearing on the motions for nonsuit and/or directed verdict, the court entertained oral argument concerning the wording of the special verdict and/or any special interrogatories that would be submitted to the jury. Appellants contended that the special verdict should require the jury to identify the specific acts on which it based any finding of police negligence. Respondents contended that the jury should only be required to state whether negligence occurred. At several points during the argument, the court expressed its belief that if the jury found negligence occurred, special interrogatories should be submitted to ensure the validity of the verdict. The matter was submitted to the jury on March 27, along with a special verdict form that did not include the special interrogatories.[13]

On April 1, 1996, the jury found that each of the police officers at the scene was negligent, that this negligence was a cause of Patrick's death, and

---

[13]At oral argument, respondents contended that appellants waived their right to contest whether the police officers owed Patrick a duty of care by requesting a special instruction

that this negligence resulted in Johnette and Gina suffering serious emotional distress as bystanders at the scene. The jury awarded Johnette $1,288,804 for the wrongful death of Patrick and $2.5 million for the negligent infliction of emotional distress. Gina was awarded $1.5 million in emotional distress damages. The jury found that Patrick was 25 percent contributorily negligent.

After this verdict was rendered, appellants renewed their request for the special interrogatories discussed at the March 25 hearing. Respondents opposed the request, arguing that the special interrogatories would be invalid because the jury had already returned its verdict. The court rejected respondents' timeliness argument, stating that this argument should have been raised at the March 25 hearing when the court indicated its intention to submit the special interrogatories to the jury in the event it found the officers were negligent.

The jury was recalled and the court submitted the special interrogatories to the jury. In response, the jury identified 13 ways in which they believed the police officers negligently handled the incident. The jury listed the factual bases of its negligence findings as follows: (1) "Lacked control of the officers"; (2) "Insufficient communications"; (3) "Lack of information"; (4) "Did not respond to suicide call as such. It was an assault response rather than assist"; (5) "Did not follow Fremont Police Dep[artment] procedures for dealing with a critical incident"; (6) "Delayed calling in medical help"; (7) "Decision to use dog prior to using a negotiator"; (8) "Allowed untrained officer to attempt negotiation"; (9) "Did not evacuate all the neighbors"; (10) "Did not maintain the psychological sanctity of the family members at the scene"; (11) "The use of [seven] armed officers left no option but force"; (12) "Once location of Pat[rick] was known, did not back down to allow calming of situation"; and (13) "Yelling and shouting at Pat[rick] did not allow for calm."[14]

---

based on *Allen v. Toten* (1985) 172 Cal.App.3d 1079 [218 Cal.Rptr. 725] (*Allen*). However, respondents' contention was not accompanied by any supporting legal authority. Moreover, it was not raised in their appellate brief. Thus, respondents have waived their right to assert this contention on appeal. (*San Mateo County Coastal Landowners' Assn.* v. *County of San Mateo* (1995) 38 Cal.App.4th 523, 559 [45 Cal.Rptr.2d 117]; *Dills* v. *Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].)

[14]In respondents' brief, they contended that this court should disregard the jury's special findings in determining whether the appellants were immune from liability under section 820.2. At oral argument, respondents suggested for the first time that this court should also

On April 19, 1996, the court entered a judgment in favor of Johnette for $2,841,603 and in favor of Gina for $1,125,000, resulting in a total judgment against appellants of $3,966,603 plus costs.

On May 7, 1996, appellants timely moved for a judgment notwithstanding the verdict and/or for new trial contending: (1) the police officers owed no legal duty to Patrick or his family; (2) the police officers and the city were immune from liability; (3) insufficient evidence was introduced to support the verdict; and (4) the awarded damages were excessive. On June 11, 1996, the court denied the motion for a judgment notwithstanding the verdict, but granted the motion for a new trial in part on the ground that emotional distress damages awarded to Johnette and Gina were excessive. The new trial was conditioned on Johnette and Gina's refusal to accept a reduction in the emotional distress damages of $750,000 and $375,000 respectively. Respondents refused to consent to this reduction.

On June 25, 1996, appellants filed this timely appeal from the April 19, 1996, judgment. Respondents have cross-appealed from the June 11, 1996, order granting a new trial on emotional distress damages.[15]

---

completely disregard the jury's special findings when analyzing any of appellants' contentions, including their claim that the responding officers did not owe Patrick a duty of care. At the outset, we note that this argument was not properly raised in respondents' brief. Moreover, the trial court's decision to submit special interrogatories to the jury was an entirely discretionary act. (*Vivion* v. *National Cash Register Co.* (1962) 200 Cal.App.2d 597, 602 [19 Cal.Rptr. 602].) Although it is generally error to proffer special interrogatories after the jury renders its verdict, we agree with the trial court that respondents' timeliness objection should have been raised at the March 25 hearing. (*Ibid.*) Thus, under the unique circumstance of this case, the trial court did not err by submitting the special interrogatories after the jury had returned its verdict. (See, e.g., *Pressler* v. *Irvine Drugs, Inc.* (1985) 169 Cal.App.3d 1244, 1251 [215 Cal.Rptr. 807].)

[15]When parties file both an appeal from an order granting new trial and a protective appeal from the judgment, we generally consider the appeal from the new trial order first. (*Milton* v. *Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 441 [313 P.2d 936]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 485, pp. 531-532.) However, where the appeal from the judgment shows that the allegations and proof of the plaintiff are insufficient to establish liability, we may depart from this normal procedure because affirmance of the order granting new trial will simply continue wasteful litigation, while reversal of the judgment will terminate it on the merits. (*Ibid.*)

In this case, both parties urge this court to deviate from the normal procedure and resolve the issues raised in appellants' appeal from the judgment first. Because we conclude respondents' claims must fail based on the purely legal ground of duty, we have elected to resolve appellants' appeal from the judgment first in order to avoid the continuance of wasteful litigation.

III.

DISCUSSION

A. *Overview*

1. *Standard of Review*

 ▮▮ Appellants contend that the jury's verdict must be reversed because the police officers on the scene owed no legal duty to Patrick or his family to act with reasonable care in order to prevent Patrick's suicide.[16] Appellants raised this issue of "duty" in their motion for nonsuit and/or directed verdict at the close of trial.[17] Thus, we review the trial court's rulings to determine whether it erred in denying the requested nonsuit or directed verdict.

 ▮ "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff'[s] favor." ' [Citation.] A mere "scintilla of evidence" does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253

---

[16]We agree with appellants that the harm suffered by Patrick is most appropriately characterized as suicide. Respondents contend the jury was free to infer that Patrick did not die from self-inflicted injuries because the possibility existed that Patrick shot himself reflexively after police officers fired the first shots. Below, the trial court repeatedly rejected this argument, concluding that to permit the jury to "speculate and suppose that the gunfire originated with the police, is not something I can accept. There is no evidence presented to the jury or to me that the officers fired first." We agree that no evidence was introduced from which a reasonable jury could conclude that the police officers fired first. The expert medical testimony was that Patrick's shot inflicted a "fatal-type" wound that he was unlikely to survive for more than five to ten minutes. Moreover, we note that the jury did not base their negligence finding on the police officers' responsive fire. Based on these factors, we discuss the harm suffered by Patrick as self-inflicted suicide. If the factual record supported the dissent's conclusion that in the absence of any threatening behavior, officers recklessly "killed" Patrick by "riddl[ing]" his body with a "hail of bullets," we certainly would agree that the officers were properly subjected to tort liability. (Dis. opn., *post*, at p. 307.)

[17]Although appellants also raised the issue of duty in their motion for judgment notwithstanding the verdict, appellants' notice of appeal did not seek review of any postjudgment motions.

Cal.Rptr. 97, 763 P.2d 948] (*Nally*), quoting 7 Witkin, Cal. Procedure (3d. ed. 1985) Trial, § 410, p. 413, original italics.) The trial court is governed by the same standard in ruling on a motion for directed verdict. (*Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].)

█ In reviewing the denial of a motion for nonsuit or directed verdict, appellate courts, like trial courts, must evaluate the evidence in the light most favorable to the plaintiff. (*Nally, supra*, 47 Cal.3d at p. 291.) Reversal of the denial of a motion for nonsuit or directed verdict is only proper when no substantial evidence exists tending to prove each element of the plaintiff's case.

Appellants contended at trial, and do so here, that they could not be liable to respondents because they had no legal duty to prevent harm to them, and because appellants' acts or omissions are protected from liability by the statutory immunity for discretionary acts set forth in section 820.2.[18]

### 2. *Scope of Review*

█ Although related, the concepts of duty and immunity invoke separate analyses. Where no legal duty is found to be owing the injured party, the court need not determine if one or more statutory immunities apply so as to insulate the entity and employee from liability. (See, e.g., *Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937, 948 [196 Cal.Rptr. 301] (*Stout*); *Allen, supra*, 172 Cal.App.3d at pp. 1091-1092, fn. 11.) "Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 201-202 [185 Cal.Rptr. 252, 649 P.2d 894] (*Davidson*).) So deeply rooted is this decision tree that the Supreme Court in *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] (*Williams*), chided trial and intermediate appellate courts that "[o]nce again the immunity cart has been placed before the duty horse." (*Id.* at p. 22.) Because we find no legal duty was owed to respondents by appellants under the facts of this case, we allow ourselves to be moved by the high court's nudge in the direction of judicial restraint. Accordingly, we do not decide the question of whether the appellants also fell within the immunity for discretionary acts provided for in section 820.2.

We turn then to the law and analysis on the limited question of duty.

---

[18]Section 820.2 provides in relevant part: "[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

### 3. *Doctrinal Bases for Determining Tort Liability of Appellants*

Until 1961, when the Supreme Court decided *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 213 [11 Cal.Rptr. 89, 359 P.2d 457], absent a waiver of sovereign immunity, the state and its political subdivisions had no tort liability to private persons. In response to the *Muskopf* decision, two years later the Legislature enacted a comprehensive statutory scheme known as the California Tort Claims Act, which reinstated the general rule of nonliability while defining the circumstances under which public entities and their employees may be sued for damages arising from tort injuries or death. Since 1963, where recovery is sought against public entities or their employees for injuries or death resulting from alleged negligent conduct, the right to recover is now defined by statute. (§ 815;[19] *Cochran* v. *Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 [205 Cal.Rptr. 1].)

Public employees are liable for injuries resulting from their acts or omissions to the same extent as private persons, except where otherwise exempted or immunized by law. (§ 820.) Public entities are correspondingly liable for the negligent acts or omissions of their employees acting within the scope of their employment except where either the employee or the public entity is immunized from liability by statute. (§ 815.2.)[20] However, "[t]he exclusive sway of statutory rules does not foreclose the aid of common law tort doctrines and analogies in ascertaining and achieving imperfectly expressed statutory objectives. [Citation.]" (*Low* v. *City of Sacramento* (1970) 7 Cal.App.3d 826, 831 [87 Cal.Rptr. 173].) ■ Where a legal duty is not created by statute, the question of whether a legal duty exists is analyzed under general principles of tort law. (See, e.g., *Brenneman* v. *State of California* (1989) 208 Cal.App.3d 812, 818 [256 Cal.Rptr. 363].)

" 'A tort, . . . involves a violation of a legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is "damnum absque injuria"—injury without wrong. [Citations.]' [Citation.] Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate

---

[19] Section 815 provides: "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."

[20] "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. [¶] (b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee . . . where the employee is immune from liability."

or legal cause of the resulting injury. [Citation.]" (*Nally, supra,* 47 Cal.3d at pp. 292-293, italics omitted.)

The existence of a duty of care is a question of law to be determined by the court alone. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Stout, supra,* 148 Cal.App.3d at p. 942; *Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847].) This is because "legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

Examining whether a legal duty exists and whether a particular defendant was negligent is not a coterminous exercise. Fulfilling the court's responsibility to determine if a legal duty exists necessarily requires consideration and balancing of sometimes competing public policies which may be irrelevant to the factual determination of whether the challenged conduct fell below the prevailing standard of care.

Despite superficial similarities, the roles of the court in resolving questions of law and of the jury as fact finder, are separate and distinct. For example, the question of foreseeability is germane to the functions of both the court in determining the presence or absence of a legal duty, and also to the role of the jury in determining whether a legal duty was breached and caused harm to the plaintiff. It is "part of the calculus to which a court looks in defining the boundaries of 'duty.' [¶] . . . [¶] The jury, by contrast, considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at pp. 572-573, fn. 6.) Therefore, we must discharge our responsibility to decide if a legal duty exists independent of the findings by the jury that appellants failed to exercise due care and proximately caused Patrick's suicide. We may not abdicate our distinct role based on the inapposite findings of the jury.

For this reason we are also not constrained by the opinion testimony of respondents' expert witnesses, who testified that the police caused Patrick's

suicide and violated the applicable standard of care by increasing the anxiety level at the scene or rushing the situation. ■ Opinion testimony is inadmissible and irrelevant to adjudging questions of law. (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 884 [254 Cal.Rptr. 336, 765 P.2d 498]; Evid. Code, § 801, subd. (b).) For example, expert opinion testimony that a driver was " 'most responsible' " for causing an accident was ruled to be an inadmissible legal conclusion in *Carlton* v. *Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428, 1432 [250 Cal.Rptr. 809].

Similarly, in *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626 [224 Cal.Rptr. 865] disapproved on another point in *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pages 881-884, the court refused to consider expert declarations expressing an opinion on whether "probable cause" existed as a defense to a malicious prosecution claim. The court explained: " '[I]t is thoroughly established that experts may not give opinions on matters which are essentially within the province of the court to decide.' [Citation.] Consequently, the 'opinion of a witness on a question of law is obviously incompetent.' [Citations.]" (179 Cal.App.3d at p. 638.) Thus, we must determine whether appellants had a duty to prevent Patrick's suicide and whether a "special relationship" was formed between the parties without relying on the expert testimony presented at trial.

In arguing in favor of a duty in this case, respondents primarily contend a duty of care exists under a *Rowland* v. *Christian* analysis. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*). They also assert two alternative claims: (1) liability may be based on the "well-recognized duty" to prevent suicide allegedly espoused in *Allen, supra,* 172 Cal.App.3d 1079; and (2) a duty may be imposed based on a "special relationship" that was created as a result of the "control" exercised by appellants once they responded to the 911 call for assistance.

In assessing the question of duty in cases challenging the conduct of law enforcement personnel generally, appellate courts in this state over the last 20 years have employed a variety of standards drawn from broad principles of tort law. Arguably, the more common approach has been to apply the multifactor duty analysis first articulated in the landowner liability case of *Rowland, supra,* 69 Cal.2d 108. (See, e.g., *Dutton* v. *City of Pacifica* (1995) 35 Cal.App.4th 1171, 1175-1176 [41 Cal.Rptr.2d 816] (*Dutton*); *Allen, supra,* 172 Cal.App.3d at pp. 1087-1091; *Shelton* v. *City of Westminster* (1982) 138 Cal.App.3d 610, 616-619 [188 Cal.Rptr. 205].) Other courts have relied on the more amorphous "special relationship" doctrine which appears to have first been applied to public entities in *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453] (*McCorkle*),

following enactment of the California Tort Claims Act, and which has been used to explain cases that imposed a duty on police officers to protect individual members of the citizenry in some contexts. (See *Williams, supra,* 34 Cal.3d at p. 24 discussing *McCorkle, supra,* 70 Cal.2d 252; *Davidson, supra,* 32 Cal.3d at p. 208 discussing *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82] (*Mann*).)

In some instances, our Supreme Court has engaged in a duty analysis under both standards (see, e.g, *Davidson, supra,* 32 Cal.3d at pp. 203-209; *Nally, supra,* 47 Cal.3d at pp. 293-300; see also *Hernandez* v. *City of Pomona* (1996) 49 Cal.App.4th 1492, 1498-1505 [57 Cal.Rptr.2d 406]; *Harris* v. *Smith* (1984) 157 Cal.App.3d 100, 107-109 [203 Cal.Rptr. 541].) However, the interrelationship between the traditional duty analysis and the "special relationship" doctrine has never been clearly defined. Moreover, the Supreme Court has yet to determine whether, or to what extent, a common law duty of care to control another's conduct is owed to individual members of the public by public safety professionals engaged in tactical field operations resulting from a citizen's request for crisis intervention.[21]

In reversing the judgment in this case, we examine the question of duty utilizing both standards. As we proceed, we note to some extent the two are in conflict. Most problematic is harmonizing the policies underlying each standard and examining the applicability of each to factual circumstances not heretofore addressed in the cases from which California's duty analysis has evolved.

B. *Duty of Care Analysis Under "Traditional" Rowland Factors*

Since *Rowland* was decided, its innumerable judicial descendants have adopted the *Rowland* court's multi-element duty assessment in determining whether a particular defendant owed a tort duty to a given plaintiff.[22] These factors include: (1) the foreseeablility of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of

---

[21]The only reported decisions examining law enforcement operations under these same general circumstances are *Lopez* v. *City of San Diego* (1987) 190 Cal.App.3d 678 [235 Cal.Rptr. 583] (*Lopez*) and *Allen, supra,* 172 Cal.App.3d 1079, in which the Fourth and Third Districts found no such duty existed. Our Supreme Court denied review in both *Lopez* and *Allen.*

[22]The precursor standard for assessing duty using a multistep procedure rather than simply relying on the foreseeability of harm was set forth in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. Nevertheless, greater attribution for the test is given to *Rowland.*

preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability. (*Rowland, supra,* 69 Cal.2d at pp. 112-113.) Where a public entity is involved, the court considers the following additional factors: the availability, cost, and prevalence of insurance for the risk involved; the extent of the agency's powers; the role imposed on it by law; and the limitations imposed on it by budget. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Dutton, supra,* 35 Cal.App.4th at p. 1175; *Allen, supra,* 172 Cal.App.3d at pp. 1086-1087.)

In *Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*), our Supreme Court has recently reiterated that in analyzing duty under the *Rowland* standard, " ' "[d]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.' " [Citation.]' " (*Id.* at p. 472, original italics.) Seeming to presage the very analysis involving the activities of law enforcement we are called upon to make in this case, the high court went on to declare: "In addition, when addressing conduct on the part of a defendant that is 'deliberative, and . . . undertaken to promote a chosen goal, . . . [c]*hief among the factors which must be considered is the social value of the interest which the actor is seeking to advance.*' [Citations.]" (*Id.* at p. 473, original italics.) Thus, we examine the multipart *Rowland* test as it applies to the circumstances before us, exploring the policies endemic to each prong of that standard while remaining mindful of the Supreme Court's pronouncement that the first policy consideration in duty analysis is " [ '[t]he social utility of the activity out of which the injury arises.']" (*Ibid.,* fn. omitted.)

## 1. *Foreseeability*

Unquestionably, it is foreseeable that when police officers respond to a person threatening suicide with a loaded firearm in a confrontational manner,[23] that person may ultimately commit suicide. It is also foreseeable that suicide could result from a decision to delay any police intervention until the

---

[23]The jury's answers to the special interrogatory provide insight into the factual basis of their verdict. The heart of their negligence finding appears to be the jury's conclusion that the police officers "[d]id not respond to suicide call as such. It was an assault response rather than assist." Thus, the jury was critical of any action taken by the police officers that "did not allow for calm" such as yelling at Patrick, refusing to "back down" after Patrick's location was known, or failing to employ a trained negotiator throughout the incident. For purposes of our discussion, the jury's findings can fairly be summarized as a determination that the police officers negligently employed a confrontational approach more in keeping with an "assault" than an "assist."

arrival of a trained negotiator, or adopting a "wait and see" approach that does not focus on requiring the suicidal individual to disarm. Moreover, injury to the police or third parties foreseeably might result from approaching an armed suicidal individual without sufficient firepower or police backup.

Indubitably, the low threshold for foreseeability is met here, yet in this highly charged, volatile situation frozen in time by the record, almost any result was foreseeable with the benefit of hindsight. We are mindful that imposing liability retrospectively lends itself to " 'typical Monday-morning quarterbacking' " (*Dutton, supra,* 35 Cal.App.4th at p. 1175, quoting *Williams, supra,* 34 Cal.3d at p. 30 (conc. and dis. opn. of Mosk, J.).) Our Supreme Court has remarked "[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury." (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814].) ▇▇▇ Because the bar of foreseeability is set so low, foreseeability alone is insufficient to create a legal duty to prevent harm. (*Id.* at p. 668, fn. 11; *Nally, supra,* 47 Cal.3d at p. 297.)

## 2. *Degree of Certainty That the Plaintiff Suffered Injury and Closeness of the Causal Connection*

The nexus between the acts or omissions of appellants and the harm suffered by respondents contemplated by a duty analysis is significantly different from that needed to satisfy a *factual* determination of proximate cause. Proximate causation requires simply that the act or omission of the defendant be a "substantial [contributing] factor" to the harm suffered. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872].) In determining the existence of a duty, we must assess not only the fact that a causative relationship exists but also we must quantify that connection in balance with the other *Rowland* factors.

Undoubtedly, Patrick suffered injury. The more troubling question is why. To what extent was it inexorably linked to the conduct of appellants? Undisputed testimony established that Patrick had been depressed and had considered suicide in the past. Immediately preceding the arrival of the police officers, Patrick had a significant altercation with his wife, secreted himself in a closet with a gun, and responded to his stepdaughter's efforts at communication by discharging his weapon. When the police located Patrick, he was clad only in his underwear, sitting in his backyard with a gun clutched to his chest.

To the extent the actions of appellants are linked to Patrick's tragic decision to end his life, they are indirect and inferential. None of the

evidence presented at trial demonstrates that the police suggested or encouraged Patrick to turn the gun on himself. On this record, the degree of certainty between the manner in which the police officers responded to the incident and Patrick's suicide is weak, and the closeness of the connection is remote.

### 3. *Moral Blame*

Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts. To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability. (See, e.g., *Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 10-11 [4 Cal.Rptr.2d 87].) Instead, courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result (see, e.g., *McCollum* v. *CBS, Inc.* (1988) 202 Cal.App.3d 989, 1005 [249 Cal.Rptr. 187]); (2) had actual or constructive knowledge of the harmful consequences of their behavior (see, e.g., *Rosenbaum* v. *Security Pacific Corp.* (1996) 43 Cal.App.4th 1084, 1098 [50 Cal.Rptr.2d 917]); (3) acted in bad faith or with a reckless indifference to the results of their conduct (see, e.g., *Dutton, supra*, 35 Cal.App.4th at p. 1176; *Merenda* v. *Superior Court, supra*, 202 Cal.App.3d at p. 11); or (4) engaged in inherently harmful acts (see, e.g., *Scott* v. *Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 517 [6 Cal.Rptr.2d 810]).

The conduct of the police officers in this incident was not morally blameworthy, as this term is understood in its legal context. The police officers promptly and dutifully responded to a citizen's call for help. Knowing little about the circumstances they would be facing, they went to the scene and encountered Patrick, who was armed with a loaded firearm and who had been engaging in behavior that was decidedly both suicidal and assaultive. They became aware that earlier in the evening he had broken dishes, knocked items off shelves, and overturned furniture, armed himself with a 9-millimeter Beretta, and fired off a round of ammunition in the house, causing respondents to flee the family home late at night. Throughout the incident, Patrick adamantly refused to do the one thing that would have alleviated the police officers' safety concerns—surrender his weapon.

Police officers often act and react in the milieu of criminal activity where every decision is fraught with uncertainty. (*Morgan* v. *District of Columbia* (D.C. App. 1983) 468 A.2d 1306, 1311.) Although appellants could have responded to this situation in a less confrontational manner, there is certainly no evidence that appellants intended or planned to precipitate Patrick's

suicide, had actual or constructive knowledge that their behavior would cause Patrick's suicide, or acted with bad faith or a reckless indifference to the consequences of their actions. Nor can the officers' attempts to investigate the situation, disarm Patrick, and dissuade him from attempting suicide be described as inherently harmful acts. Under these facts, there was no moral blame attendant to the conduct of appellants.

### 4. *Policy of Preventing Future Harm, Extent of Burden to Appellants, and Consequences to the Community*

Respondents contend that imposing liability is "necessary to send the message that it is important to deal sensitively and appropriately with a troubled person who is considering ending his own life." They argue that the present case implicates "only one policy consideration: that of preventing a needless death." Thus, they contend the prevention of future harm can only be furthered by imposing a legal duty on law enforcement to act nonnegligently in handling emergency suicide calls. Although we agree that encouraging police officers to deal with a suicidal person in a sensitive and appropriate manner is an important goal, we question whether the public policy of preventing future harm will actually be furthered by imposition of liability.

In *Allen, supra,* 172 Cal.App.3d at pages 1084-1091, the court considered whether to impose a duty on police officers to use reasonable care to prevent family members brought to the scene of a threatened suicide from sustaining emotional distress. The court observed that police officers responding to the scene of a potential suicide must consider three separate interests. (*Id.* at p. 1089.) In order of their importance, these interests are: (1) the physical safety of the community, including themselves, other citizens, and family members; (2) the physical safety of the potential victim (the threatened suicide); and (3) the psychological sanctity of a family member at the scene.

We agree with the *Allen* court's conclusion that police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal person. Protection of the physical safety of the police officers and other third parties is paramount.[24] (*Allen, supra,* 172 Cal.App.3d at p. 1089.)

The *Allen* court explained its reference to the need to protect the physical safety of police officers and others by noting: " 'Statistically, the homicide

---

[24]Respondents contend the *Allen* court held police officers have a duty to provide assistance to individuals threatening suicide based on the court's conclusion that bringing family members to the scene of a suicidal standoff is not morally blameworthy because "[p]olice officers are responsible for guarding the safety and well-being of the community at large and hence also for dissuading potential suicide victims from taking their own lives." (172 Cal.App.3d. at p. 1088.) We reject this contention. Taken in context, the *Allen* court's

rate is higher among persons with a history of suicide attempts, and the converse is also true: the rate of suicide attempts is higher among persons with assaultive histories. . . . The police officer should be particularly wary in cases where an individual has locked himself in his house or car and is threatening to kill himself with a gun. It only takes a moment of turning his resentment over feeling unloved outward, instead of inward, for him to begin firing at the officer.' (Cooke, *Training Police Officers to Handle Suicidal Persons* (Jan. 1979) 24 J. Forensic Sci. 227, 232.)" (*Allen, supra*, 172 Cal.App.3d at p. 1089, fn. 8.)

The *Allen* court concluded that the burden to the defendant weighed against the imposition of a duty of care to family members at the scene because imposing liability for emotional distress would elevate a family member's psychological sanctity above the safety and well-being of the community, the police, and the person who is threatening suicide. (*Allen, supra*, 172 Cal.App.3d at p. 1089.) The consequences to the community of protecting family members from the chance of witnessing a suicide, would be "the occurrence of greater numbers of suicides, homicides and woundings." (*Id.* at p. 1090.)

In keeping with the analysis employed by the *Allen* court, we conclude that imposing liability for the negligent handling of a threatened suicide improperly elevates the interests in preserving the life of the person threatening suicide over the interests of public safety and the physical safety of police officers.

Moreover, at a minimum, imposition of a tort duty on public safety officers engaged in disarming suicidal persons is certainly likely to result in a more tentative police response to such crises. A suicide crisis involving a loaded firearm is an unstable situation in which the police must be free to make split-second decisions based on the immediacy of the moment. Knowledge that any unsuccessful attempt at intervention will be subjected to second-guessing by experts with the 20/20 vision of hindsight years following the crisis is likely to deter the police from taking decisive action to protect themselves and third parties. (Cf. *Scott* v. *Henrich* (9th Cir. 1994) 39 F.3d 912; see also *Rayano* v. *City of New York* (1955) 138 N.Y.S.2d 267 [imposing liability for police judgments exercised under conditions of peril and stress is likely to result in unduly hesitant police responses to emergency situations].) Certainly, the risk of inhibiting law enforcement intervention necessary for the preservation of community welfare and peace outweighs the importance of ensuring nonnegligent treatment of persons threatening

---

reflections on the nature of police officers' employment responsibilities fall far short of a holding imposing a legal duty on police officers to prevent threatened suicides.

suicide—a consideration we readily acknowledge and which is only minimized by its comparison to the greater public interest.

Furthermore, exposing police officers to tort liability for inadequate or unreasonable assistance to suicidal individuals could inhibit them from providing intervention at all.[25] The resulting loss of an important resource in dealing with threatened suicides would be devastating to such affected communities.

In this respect our view is similar to the analysis employed by Division One of this district in *Dutton, supra,* 35 Cal.App.4th 1171. In *Dutton,* the court held that a police officer owed no duty of care to a teenager whom the officer had instructed to leave a public park after curfew, and ordered to ride in the back of a truck driven by another minor. In analyzing the public policy implications of imposing such a duty, the court concluded "Were we to impose a duty in this case, a police officer confronting a group of loitering teenagers would be left with only two options—leaving the teenagers alone (thereby compromising the officer's ability to protect both the teenagers and the public generally) or assuming full responsibility for their welfare (thereby compromising the officer's ability to protect the remainder of the public)." (*Id.* at p. 1176.)

Like the *Dutton* court, we will not impose a duty that requires police officers to choose between refusing to offer assistance at the scene of a threatened suicide or assuming full responsibility for the suicidal individual's welfare. This choice discourages police officers from rendering assistance in these inherently unpredictable situations in which even highly trained mental health professionals cannot guarantee success. Any reduction in the availability of police assistance at the scene of threatened suicides would severely compromise public safety and likely result in more deaths or injuries.

---

[25]In dictum, the *Allen* court implied that police officers have a tort duty to intervene when an individual threatens others or themselves with firearms, based on the applicable statutes. (See *Allen, supra,* 172 Cal.App.3d at p. 1090, citing Pen. Code, §§ 417, subd. (a)(2), 417.8; Welf. & Inst. Code, § 5150.) We disagree.

Police officers have the authority, but not the "duty," to enforce the law. (See, e.g., cf. *Williams, supra,* 34 Cal.3d at p. 24 [state highway patrol has the right, but not the duty, to investigate accidents].) Neither Penal Code sections 417, subdivision (a)(2) and 417.8, nor Welfare and Institutions Code section 5150 impose a mandatory duty upon police officers to intervene in these crises. Penal Code sections 417, subdivision (a)(2), and 417.8 merely define crimes for which a person threatening suicide with a firearm might be charged. Welfare and Institutions Code section 5150 permits, but does not require, police officers to facilitate the involuntary commitment of a person who is a danger to themselves or others, but does not require this intervention. (Welf. & Inst. Code, § 5150 ["When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, . . . *may,* upon probable cause, take, or cause to be taken, the person into custody and place him or her in a [mental health] facility. . . ."] (Italics added.).)

Yet, respondents correctly point out that not imposing a legal duty on police officers to take reasonable measures to prevent a threatened suicide correspondingly diminishes the benefits to the public gained by requiring law enforcement personnel to be accountable for their unreasonable conduct. While this is so to some extent, we conclude on balance the interests to the public in protecting against future harm and the detrimental consequences to the public in imposing a tort duty under such circumstances, outweigh the partial loss of legal accountability occasioned by a rule of nonliability. Moreover, our decision does not insulate police misconduct from all legal and internal scrutiny. Plaintiffs may still pursue a legal action when police misconduct constitutes an intentional tort or a violation of an individual's constitutional or other federally protected rights. (42 U.S.C. § 1983). Furthermore, citizens may obtain internal review of police conduct by filing a citizen complaint (Pen. Code, § 832.5), and police officers may be sanctioned as a result of internal disciplinary proceedings. (See *Warren* v. *District of Columbia* (D.C.App. 1981) 444 A.2d 1, 8 (*Warren*).) The existence of these other avenues for redress undercuts the need for additionally imposing tort liability to deter police officers from responding to a threatened suicide in an unreasonable manner.

5. *The Availability, Cost, and Prevalence of Insurance for the Risk Involved*

Insurance may be available to cover public entities for the negligence of their employees, yet this factor has "little relevance" where significant policy considerations militate against the imposition of a duty of care. (*Allen, supra,* 172 Cal.App.3d at p. 1090.) Like the *Allen* court, we believe that the risk of liability will affect police conduct regardless of whether an adverse judgment is covered by insurance. Only the most irresponsible police officers would shrug off the possibility of a judgment holding them personally liable for another's suicide solely because monetary damages would not be coming out of their own pocket. Moreover, an inordinate amount of public time, and thus money, would be consumed in the litigation of such private claims that otherwise could be utilized in increasing the quality of police services provided to the public. (Cf. *Warren, supra,* 444 A.2d at p. 8.)

6. *The Extent of the Agency's Powers, the Role Imposed Upon It by Law and the Limitations Imposed Upon It by Budget*

Our Supreme Court has acted to dispel "widely held misconceptions" that law enforcement's public safety function imposes a duty on police officers to protect individual constituents as opposed to the general public. (*Williams, supra,* 34 Cal.3d at pp. 23-24.) Although police officers regularly respond to

third parties' requests for assistance, they are not professional Good Samaritans subject to a " 'novel' " claim of malpractice whenever their response falls short of " 'what reasonably prudent police employees would have done in similar circumstances.' " (*Id.* at p. 24, fn. 3, quoting with approval *Warren, supra,* 444 A.2d at p. 8.) " 'A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, *but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.*' " (34 Cal.3d at pp. 23-24, original italics.)

The so-called public duty rule adopted by the court in *Williams* is believed to be derived from the early case of *South* v. *Maryland* (1855) 59 U.S. (18 How.) 396, 403 [15 L.Ed. 433, 435] in which the United States Supreme Court stated that law enforcement is not legally responsible to individual citizens to prevent their victimization by crime because this responsibility is " 'a public duty, for neglect of which he is amenable to the public and punishable by indictment only.' " (Bonnett, *Holsten v. Massey: The Coexistence of the Public Duty Doctrine and the Governmental Tort Claims and Insurance Reform Act* (1997) 100 W. Va. L.Rev. 243, 249, fn. omitted.) It is based on policy concerns that the establishment of a privately enforceable duty to use reasonable diligence in the performance of public functions would "effectively bring the business of government to a speedy halt, . . ." (*Warren, supra,* 444 A.2d at pp. 8-9.) As the *Warren* court reflected, "A publicly maintained police force constitutes a basic governmental service provided to benefit the community at large by promoting public peace, safety and good order. The extent and quality of police protection afforded to the community necessarily depends upon the availability of public resources and upon legislative and administrative determinations concerning allocation of those resources. [Citation.] The public, through its representative officials, recruits, trains, maintains and disciplines its police force and determines the manner in which personnel are deployed. At any given time, publicly furnished police protection may accrue to the personal benefit of individual citizens, but at all times the needs and interests of the community at large predominate." (*Id.* at p. 4.)

Admittedly, law enforcement largely acts to preserve the peace by its interactions with individual members of the public. Nevertheless, the role of law enforcement in society is to act in the general public interest. Permitting potential suicide victims and their families to hold police officers personally liable for the negligent handling of a suicide crisis conflicts with the public nature of protection services police officers provide to the community at large.

Moreover, imposing a duty on law enforcement to take reasonable steps to prevent a threatened suicide would have significant budgetary implications and improperly insinuate the civil justice system into the allocation of law enforcement resources. The degree of training devoted to suicide intervention and prevention would be dictated by events in the civil courtroom, and not necessarily by the needs of the community. Compelling the reallocation of finite public resources may serve to benefit individuals in a suicidal crisis, but that benefit may be at the expense of other, more pressing law enforcement needs and programs.

### 7. Balancing

■ On balance, the relevant public policy considerations militate against imposing a legal duty on police officers to take reasonable steps to prevent a threatened suicide from being carried out. The foreseeability and certainty of harm suffered are factors which favor imposing a duty. The absence of moral blame, the remoteness of the connection between the conduct of appellants and the harm suffered, the policy of preventing future harm, consequences to the community, the role of law enforcement in society, and the potential detriment to the public in imposing judicial allocation of resources all heavily favor shielding law enforcement personnel from tort liability in instances such as this.

Moreover, the majority of the disputed conduct in this case was the product of Sergeant Osawa's deliberate tactical decisions designed to maximize the safety of the responding officers. Therefore, under *Parsons, supra,* 15 Cal.4th at page 472, we must also consider the social value of the interest Sergeant Osawa sought to advance. (*Ibid.*) The social value of protecting the lives of police officers involved in a standoff with an armed individual is extremely high. Accordingly, after balancing the relevant considerations, we conclude that appellants owed respondents no duty of care under this analysis.

### C. Duty of Care Analysis Under the Special Relationship Exception

#### 1. The Nature of the Special Relationship Exception and Its Application to Suicide Prevention

States adopting the public duty rule often permit a "narrow exception"[26] for unusual police conduct that creates a "special relationship" between the police officer and an individual member of the public. (See generally, Comment, *Washington's Special Relationship Exception to the Public Duty*

---

[26]See *Poliny v. Soto* (1988) 178 Ill.App.3d 203 [127 Ill.Dec. 397, 533 N.E.2d 15, 18].

*Doctrine* (1989) 64 Wash. L.Rev. 401.) ■■ This special relationship exception to the public duty rule has been adopted in California as well. In the case of law enforcement officers, a special relationship only has been found in a *"few narrow circumstances."* (*M.B.* v. *City of San Diego* (1991) 233 Cal.App.3d 699, 704-705 [284 Cal.Rptr. 555], italics added (*M.B.*).) Absent a special relationship creating a special duty, the police have no legal duty to control the conduct of others. (*Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111, 1122 [222 Cal.Rptr. 239] (*Von Batsch*).)

■■ Respondents argue that such a special relationship arose between Patrick and appellants, thereby creating a duty to exercise reasonable care to prevent Patrick's suicide. In cases involving suicide, courts have been extremely reluctant to impose liability based on the special relationship exception. (See, e.g., *Nally, supra,* 47 Cal.3d 278; see also *Lee* v. *Corregedore* (1996) 83 Hawaii 154 [925 P.2d 324]; *Donaldson* v. *YMCA* (Minn. 1995) 539 N.W.2d 789, 792.) In *Nally,* our Supreme Court explained that a special relationship giving rise to a duty to exercise due care in order to prevent suicide has only been imposed "in the limited context of hospital-patient relationships where the suicidal person died while under the care and custody of hospital physicians who were aware of the patient's unstable mental condition." (47 Cal.3d at pp. 293-294, citing *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519] (*Meier*); *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193] (*Vistica*).) The Supreme Court described *Meier* and *Vistica* as "carefully limited precedent" that "severely circumscribe the duty they create," and declined to extend this duty of prevention to nontherapist counselors.[27] (*Nally, supra,* 47 Cal.3d at pp. 293-296.) The *Nally* court held "Neither [*Meier* nor *Vistica*] suggested extending the duty of care to personal or religious counseling relationships in which one person provided nonprofessional guidance to another seeking advice and the counselor had no control over the environment of the individual being counseled." (*Id.* at p. 294.)

The Supreme Court also rejected an argument that nontherapist counselors have a duty to prevent foreseeable suicides based on dictum from *Bellah* v.

---

[27]It is important to note that in the context of suicide prevention no court has suggested, even in dictum, that a special relationship may be premised on conduct that increased a preexisting risk that the threatened suicide would be carried out. In *Nally,* one could argue that defendants increased the risk that the threatened suicide would be carried out by advising the decedent that he would still go to heaven if he committed suicide. However, the *Nally* court did not even consider imposing a special relationship on this basis. Instead, the court endorsed cases carefully limiting the special relationship exception to professional malpractice claims or claims of negligence asserted against inpatient facilities or clinicians who were aware of a patient's suicidal tendencies, and who actually controlled the suicidal patient's environment. (*Nally, supra,* 47 Cal.3d at pp. 294-296.)

*Greenson* (1978) 81 Cal.App.3d 614, 620-623 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118] that appeared to extend the duty to prevent suicide to treating psychiatrists in the outpatient context. (*Nally, supra*, 47 Cal.3d at pp. 294-296.) The *Nally* court concluded: "Rather than create a duty to prevent suicide, *Bellah* (and *Meier* and *Vistica*) recognized that a cause of action may exist for *professional malpractice* when a psychiatrist's (or hospital's) treatment of a suicidal patient falls below the standard of care for the profession, thus giving rise to a traditional malpractice action." (*Id.* at pp. 295-296, fn. omitted, original italics.)

Respondents contend, however, that *Meier* and *Vistica* support imposing a duty on police officers to prevent threatened suicides because police officers have even more ability to control suicidal individuals than the staff at an inpatient psychiatric facility. They observe that police responding to a threatened suicide have the ability to surround and control the suicidal individual, whereas mental health professionals will not always be in the immediate vicinity of a confined patient when they make a suicide attempt. This contention has no merit.

The *Nally* court's reasons for refusing to extend the duty to prevent suicide discussed in *Meier*, *Vistica*, and *Bellah* to nontherapist counselors are equally applicable to this case. Hospitals providing mental health services to suicidal inpatients function within an institutional setting of their own making. Every aspect of the patients' environment may be regulated. Hospitals may restrict a suicidal patient's access to weapons or other items that may be used as a means of carrying out the threatened suicide. The very *raison d'être* of such facilities is therapeutic. These medical institutions provide treatment programs specifically designed to manage and treat the patient's self-destructive impulses.

In contrast, law enforcement personnel render assistance to suicidal individuals at the scene, virtually always in response to emergency calls. They must take the individual and their environment as they find them. Despite police officers' ability to surround a suicidal person physically, they cannot "control" him or her. Often the person threatening suicide already possesses the means by which to end his or her life. The suicidal individual may be barricaded in a building, holding others hostage, or threatening to end their life in any number of dangerous environments.[28] Furthermore, like nontherapist counselors, police officers do not render professional counseling in the

---

[28]Cases and commentators have recognized that the circumstances arising from state custodial suicides are in a class unto themselves and invoke considerations, including due process issues, which differentiate these cases from *Nally* and *Allen*, where formal state custody was absent. (See *DeShaney* v. *Winnebago Cty. Soc. Servs. Dept.* (1989) 489 U.S. 189

context of a supervised medical relationship, and have no duty to prevent foreseeable suicides based on traditional notions of professional malpractice. Because nontherapist counselors and police officers share a similar inability to control the suicidal individual's environment, it would be equally inappropriate to extend the "previously carefully limited precedent" set forth in *Meier* and *Vistica* to police officers at the scene of a threatened suicide. Thus, application of the special relationship exception to police officers at the scene of a suicidal standoff is not supported by *Nally, Meier,* or *Vistica.*

## 2. The Special Relationship Exception as Applied to Law Enforcement

A long line of cases has held that a special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene. (See, e.g., *Lopez, supra,* 190 Cal.App.3d at p. 681 [no special relationship between police responding to restaurant massacre scene and victims of massacre where police delayed acting on plan to " 'neutralize' " murderer]; *Von Batsch, supra,* 175 Cal.App.3d at p. 1122 [no special relationship between county and decedent's surviving wife when county's officers responded to a burglar alarm, searched the premises, and erroneously advised decedent's co-employees that no intruders were on the premises]; *Williams, supra,* 34 Cal.3d at p. 24 [no special relationship between stranded or injured motorist and police based on fact that police stopped to aid her]; *Shelton* v. *City of Westminster* (1982) 138 Cal.App.3d 610, 621 [188 Cal.Rptr. 205] [no special relationship between parents filing missing person report and police undertaking investigation of son's whereabouts].) Responding to a citizen's call for assistance is "basic to police work and not 'special' to a particular individual." (*M.B., supra,* 233 Cal.App.3d at p. 706.)

In keeping with this notion that police officers are not ordinarily personally accountable to individual citizens in need of assistance "[r]ecovery has been denied, . . . for injuries caused by the failure of police personnel to respond to requests for assistance, the failure to investigate properly, or the failure to investigate at all, where the police had not induced reliance on a promise, express or implied, that they would provide protection. [Citations.]" (*Williams, supra,* 34 Cal.3d at p. 25.)

Perhaps fortified by the recognition that the special relationship exception is reserved for a limited class of unique cases, precious few courts have actually imposed a duty of care on law enforcement officers under this

[109 S.Ct. 998, 103 L.Ed.2d 249]; Robertson, *Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide* (1993) 24 Toledo L.Rev. 807, 812-813, and authorities cited in fn. 20.)

doctrine. Of the legion of cases addressing this issue, our research has uncovered only five such cases. These cases involved police officers who made misrepresentations that induced a citizen's detrimental reliance (*Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298 [191 Cal.Rptr. 704] (*Johnson*), placed a citizen in harm's way (*Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923 [281 Cal.Rptr. 500] (*Carpenter*); *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113] (*Wallace*); *McCorkle, supra,* 70 Cal.2d 252, or lulled a citizen into a false sense of security and then withdrew essential safety precautions (*Mann, supra,* 70 Cal.App.3d 773).

Importantly, the challenged conduct in these decisions did not involve deliberate tactical choices made by police officers while intervening in an unfolding life-threatening crisis. In our view, they were never intended to apply when an officer's strategic response to a citizen's request for assistance fails to prevent the occurrence of a preexisting risk. Yet, respondents argue that *Johnson, supra,* 143 Cal.App.3d 298, supports their contention that police officers enter into a special relationship with a citizen in need of assistance whenever "police take control of the situation." We are not persuaded.

In *Johnson,* county sheriffs arrested Michael Johnson because he was driving the wrong direction on the freeway. (*Johnson, supra,* 143 Cal.App.3d at p. 304.) He told the sheriffs that he was attempting to commit suicide because " 'people' " were trying to torture and kill him, and pleaded with the sheriffs to kill him. (*Ibid.*) The sheriffs took Johnson into custody, charging him with assault with a deadly weapon. (*Ibid.*) Shortly thereafter, Johnson's wife informed the sheriffs that her husband was a paranoid schizophrenic who had been repeatedly hospitalized and required medication to control his suicidal tendencies. (*Ibid.*) The sheriffs promised to hospitalize and medicate Mr. Johnson and told his wife not to worry or interfere. (*Ibid.*) Despite this promise, Johnson was not medicated or involuntarily committed. Instead, the sheriffs released Johnson three days after his arrest without notification to his wife. (*Ibid.*) He committed suicide two days after his release. (*Ibid.*) The *Johnson* court held the sheriffs had a duty to warn Johnson's wife before his release that the promised medical care had not been provided because a "special relationship" existed between the sheriffs, Johnson and his wife. (*Id.* at p. 311.)

*Johnson* is manifestly distinguishable from the facts of this case. At the outset, the *Johnson* court did not impose a duty on police officers to take measures to prevent the threatened suicide. Rather, the court held that the police officers had a duty to warn Johnson's wife so she could make

arrangements to provide him with necessary treatment. Moreover, the holding in *Johnson* was not based on the fact that police officers had "take[n] control of the situation." Instead, it resulted from a combination of the following factors: (1) the breach of an express promise to medicate and/or obtain medical attention for Johnson; (2) the fact that this promise lulled Johnson's wife into a false sense of security that treatment was being provided for Johnson; and (3) Johnson's wife's detrimental reliance on this promise, which caused her to refrain from making her own arrangements for Johnson's care. Thus, the *Johnson* case fell within established exceptions to the general rule that police have no duty to control a third party's conduct, which are not applicable to this case. (See, e.g., *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938, 946 [41 Cal.Rptr. 508]; *Mann, supra,* 70 Cal.App.3d 773.)

Here, the responding officers made no express or implied promises that they would prevent Patrick's suicide or that they would approach Patrick in a nonconfrontational manner. Nor have respondents alleged that detrimental reliance occurred.[29] While our Supreme Court has held that "a promise and reliance thereon are [not] indispensable elements of a special relationship,"

[29]For the first time at oral argument, respondents suggested that a special relationship may be established based on the detrimental reliance of Johnette and Gina, as opposed to any detrimental reliance by Patrick. We need not consider this belated contention because it was not properly raised in respondents' appellate brief. Moreover, we note that respondents have sued for wrongful death and emotional distress arising from having witnessed wrongful injury to Patrick. As alleged in their complaint, these causes of action are derived solely from the officer's alleged negligence vis-à-vis Patrick. Thus, their right to recover is dependent upon appellants' having breached a duty owed to *Patrick,* not to respondents. This is because the claims asserted below require respondents to "stand[] 'in [the] shoes' . . .'" of the decedent. (*Salin* v. *Pacific Gas & Electric Co.* (1982) 136 Cal.App.3d 185, 192-193 [185 Cal.Rptr. 899]; *Argonaut Ins. Co.* v. *Superior* Court (1985) 164 Cal.App.3d 320, 324 [210 Cal.Rptr. 417].)

Further, even if we accept the premise that the detrimental reliance requirement may be satisfied by the detrimental reliance of someone other than the person threatening suicide, such reliance cannot be inferred from general allegations of negligence—it must be pleaded with specificity in the complaint. (See, e.g, *Williams, supra,* 34 Cal.3d at p. 27; *Hernandez* v. *City of Pomona, supra,* 49 Cal.App.4th at p. 1502; *Stout, supra,* 148 Cal.App.3d at p. 945; *Morgan* v. *County of Yuba, supra,* 230 Cal.App.2d 938, 945.) Respondents' complaint failed to do so.

Not only did respondents fail to plead detrimental reliance, they also failed to prove it. The record contains no evidence that either Gina or Johnette detrimentally relied on the conduct of the police officers by foregoing other means of assisting Patrick. The dissent's statement that "[Johnette] and [Gina] testified that the police placed them under strict constraints, establishing their inability to personally intercede, seek assistance from decedent's friend Alan Kirshner (as one expert thought appropriate) or others, or see to it that Patrick remained undisturbed until he sobered up" is simply inaccurate. (Dis. opn., *post,* at pp. 296-297, fn. 2.) The only testimony even touching on respondents' belated detrimental reliance claim is Gina's testimony that a police officer restrained Johnette from running to Patrick. Notably, there was no evidence that Patrick would have benefited from Johnette's physical presence and direct participation during the suicidal standoff. This is understandable given the history

the plaintiff must still plead and prove that police conduct in a situation of dependency lulled the plaintiff into a false sense of security, thereby inducing the plaintiff's detrimental reliance on the police for protection. (*Williams*, *supra*, 34 Cal.3d at p. 25.) Unlike the plaintiffs in *Johnson*, respondents in this case have neither alleged the existence of a duty under this theory in their complaint, nor briefed the matter in this appeal. (See, e.g., *Hernandez v. City of Pomona*, *supra*, 49 Cal.App.4th at p. 1502; *Stout*, *supra*, 148 Cal.App.3d at p. 945.)

Accordingly, those authorities which imposed a duty under the special relationship exception involved materially different facts from the circumstances of this case. They do not support the imposition of a tort duty here.

### 3. *Basing the Special Relationship Exception on an Increased Risk of Harm*

An alternative argument advanced to support a legal duty, which is made only obliquely by respondents[30] but embraced by the dissent, is that a special relationship arose because the police officers engaged in affirmative conduct that increased the risk of harm to Patrick.

The notion that the special relationship exception may be expansively interpreted to impose a duty of care whenever a law enforcement officer's affirmative conduct increases a preexisting risk of harm is derived from *McCorkle*, *supra*, 70 Cal.2d 252 and *Mann*, *supra*, 70 Cal.App.3d 773. In *McCorkle*, Officer Lombardo was dispatched to the scene of an automobile accident, in which the plaintiff had received minor injuries. (*McCorkle*, *supra*, 70 Cal.2d at p. 259.) After his arrival, the officer discussed the events leading up to the accident with the plaintiff while they stood at the corner of an intersection. Then Officer Lombardo directed the plaintiff to follow him into the intersection to show him where the accident occurred. (*Ibid*.) The officer did not set out flares to direct other motorists to avoid driving through the scene of the accident. (*Ibid*.) While in the intersection, the light changed and the plaintiff was hit by oncoming traffic. (*Id*. at pp. 260-261.)

Although the *McCorkle* opinion never addressed the question of duty or even mentioned the special relationship doctrine, *McCorkle* is routinely cited for the proposition that liability may be imposed upon police officers where their affirmative conduct places a person in peril *or* increases an individual's

---

of family discord, and the increase in Patrick's level of agitation when he mistakenly believed that Gina had entered the backyard and was directly participating in the negotiations.

[30]For example, respondents characterize the conduct of police officers as "rapidly exacerbat[ing] the crisis they had created."

risk of harm. (See, e.g., *Williams, supra,* 34 Cal.3d at p. 24; *Davidson, supra,* 32 Cal.3d at p. 206; *M.B., supra,* 233 Cal.App.3d at pp. 704-705.)

Despite this broad dictum, not one of the cases in which courts have imposed a duty on police officers based on the special relationship exception relied solely on affirmative police conduct that increased a preexisting risk of harm. For example, in *McCorkle,* the plaintiff was speaking with the investigating police officer from the safety of the corner when Officer Lombardo directed the plaintiff into the middle of the intersection. By directing the plaintiff into a dangerous intersection, he actually exposed the plaintiff to a new risk of injury by placing the plaintiff in harm's way.

Similarly, the remaining cases in which a duty was imposed under the special relationship exception based on the impact of a defendant's conduct on the plaintiff's risk of harm have all involved instances where law enforcement officers placed the plaintiff in a position of peril. (*Carpenter, supra,* 230 Cal.App.3d 923; *Wallace, supra,* 12 Cal.App.4th 1385; see also *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] [probation officer placed juvenile in foster parents' home without warning foster parents of child's homicidal tendencies].)

Neither are we persuaded that the 1977 decision in *Mann, supra,* 70 Cal.App.3d 773, relied upon by the dissent, warrants a different conclusion. In *Mann,* the court found that a special relationship was formed where highway patrolmen came to the aid of stranded motorists by positioning their police car behind two stalled cars and activating their lights, but later withdrew this protection without warning.[31]

Our Supreme Court has cited *Mann* with approval, describing it as a case in which "the *conduct* of a police officer, in a situation of dependency, results in detrimental reliance on him for protection." (*Williams, supra,* 34 Cal.3d at p. 25, italics omitted.) The high court explained that a duty was

---

[31]The original Court of Appeal decision in *Mann* is of questionable value in assessing the issue of duty here for several reasons. First, the holding in *Mann* was specifically overruled by the Legislature in 1979, when it enacted section 820.25 as *urgency legislation* to prevent what it viewed as a dangerous expansion of the liability of peace officers. (*Williams, supra,* 34 Cal.3d at pp. 25-26, fn. 5.) Although this opinion can be considered an enviable model of brevity when compared to contemporary opinion writing, nowhere in the four paragraphs of discussion of legal duty does the court intimate that this rule should be extended to police conduct involving tactical choices in the midst of an ongoing crisis. Remarkably, the decision characterizes its rationale as creating "essentially an estoppel theory of liability," which it plainly is not. (*Mann, supra,* 70 Cal.App.3d at p. 780, fn. 6.) Last, its doctrinal confusion becomes even more evident, considering it purports to dispose of the municipalities immunity defense *before* undertaking its duty analysis—a practice ironically criticized in *Williams.* (*Williams, supra,* 34 Cal.3d at p. 22.)

rightfully imposed in·*Mann* because "the officers' conduct contributed to, increased, and changed the risk which would have otherwise existed. They stopped to investigate and they took affirmative steps to provide assistance, lulling the injured parties into a false sense of security and perhaps preventing other assistance from being sought." (*Ibid.*)

This rationale reveals that the cornerstone of the *Mann* decision was not simply police conduct that increased a preexisting risk of harm. Rather, the Supreme Court's approval of the result in *Mann* rested on a variety of factors including: (1) police conduct that not only contributed to and increased the preexisting risk, but also *changed* the risk that would otherwise have existed; (2) the motorists' situation of dependency; (3) the motorists' detrimental reliance on the officers' conduct that prevented them from seeking other assistance; and (4) the fact that the officers' conduct lulled the motorists into a false sense of security.

Even if respondents had properly alleged a theory of liability under *Mann*, none of the *Mann* factors are present in this case. First, while the officers' conduct arguably increased the preexisting risk that Patrick would commit suicide, it did not change the preexisting risk that Patrick would do so. Second, Patrick was not in a comparable situation of dependency. Unlike the stranded motorists in *Mann*, who were injured when the police abruptly withdrew their only source of protection, Patrick was not a helpless or dependent victim relying on police protection. Patrick was armed with a loaded firearm and presented a threat to the lives of the responding police officers. Rather than relying on police efforts, he was uncooperative and continually requested police to leave the area. Patrick was not lulled into a false sense of security by the protective measures undertaken by the police. Although police officers wanted to assist Patrick by taking him into custody for mental health evaluation and treatment, their efforts were thwarted by Patrick's refusal to surrender his firearm or cooperate with the responding officers. Thus, none of the factors that the Supreme Court identified as justifying the *Mann* decision are present in this case.

Moreover, even if we assume that the creation of a special relationship bears some association to the degree to which the conduct increases a risk of harm, no authority exists imposing a duty where police conduct only incrementally increased the risk to which the injured person was already exposed. In volatile situations, one can always argue that the arrival of police officers caused an incremental increase in tension at the scene, and thus increased the risk of injury occurring Yet, despite the fact that basic police work often involves anxiety-producing conduct such as the display of weapons, the shining of flashlights, or the shouting of orders, the social utility of involving police in suicidal standoffs weighs against the imposition of liability. To

expansively construe the special relationship doctrine to encompass such incremental increases in a preexisting risk would eviscerate our Supreme Court's adoption in *Williams, supra,* 34 Cal.3d at page 23, of the public duty rule, which protects police officers from the burden of assuming greater obligations to others by virtue of their employment.[32]

In addition, if a duty of care was imposed in each case where there was some progressive, increased chance of injury stemming from a preexisting harm, the special relationship doctrine would be in irremediable conflict with the traditional duty analysis derived from *Rowland,* discussed *ante.* Where police conduct results in some increase in a preexisting risk of harm, but an analysis of the traditional *Rowland* factors weighs against the imposition of a duty, we conclude that no special relationship duty may be imposed. (Cf. *Hansra* v. *Superior Court* (1992) 7 Cal.App.4th 630, 646 [9 Cal.Rptr.2d 216] [resolution of the question whether a special relationship gives rise to a duty of protection requires consideration of the same *Rowland* factors underlying any duty of care analysis].)

Our conclusion that the question of duty must not ignore matters of policy regardless of whether the duty purportedly arises under the special relationship doctrine is supported by the commentators. For example, in a 1991 law review article,[33] Professor John M. Adler examined the historic attempts in California case law to alternatively anchor special relationship analysis in

---

[32]The dissent contends that the imposition of liability in this case would impose the same obligations on police officers as private citizens, rather than heightening their obligations on account of their employment. We disagree. The jury instructions given in this case demonstrate how the duties imposed on these officers far exceeded the duties imposed on the average citizen. The jury was instructed that these police officers had a series of special obligations over and above the general duty of acting with reasonable care. The jury was informed that officers at the scene of a threatened suicide are required to protect the physical safety of the community, including themselves, other citizens, and family members, protect the physical safety of the person threatening suicide, and protect the psychological safety of the family members at the scene. Moreover, the court instructed the jury that it would be helpful to measure the responding police officers' conduct against that of ordinary prudent police officers in making their negligence determination. These instructions are reminiscent of the novel professional malpractice theory expressly rejected in *Williams, supra,* 34 Cal.3d at page 24, footnote 3.

[33]Adler, *Relying Upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others* (1991) Wis. L.Rev. 867 (*Relying Upon the Reasonableness of Strangers*). In the course of his discussion, Professor Adler disinters the same 1908 article by Professor Bohlen cited by the dissent. During that discourse, Professor Adler notes the analytical flaws inherent in finding a special relationship based on the misfeasance/nonfeasance distinction.

terms of the misfeasance/nonfeasance dichotomy and "dependency" relationships,[34] as well as those based on "control," concluding that relying on any of these distinctions to impose a legal duty is problematic: "For these reasons, special relationship analysis is of little predictive value and may not even accurately describe the concerns that determine the outcome of a significant number of cases." (*Relying Upon the Reasonableness of Strangers*, *supra*, Wis. L.Rev. at p. 886, fn. omitted.)[35] After reviewing the decisions imposing a duty under the special relationship exception, Adler concluded that courts have substituted the rubric of "dependency," "control," or "misfeasance" for traditional policy analysis in determining legal duty. Instead of engaging in this type of "distortion," Adler proposes a definition of the special relationship exception that embodies the very factors employed in a *Rowland* analysis. (*Id.* at pp. 869, 900-911.)[36]

Indeed, pedantic use of the Restatement (Second) of Torts to establish the parameters of tort duty, while eschewing public policy concerns, is contrary to modern jurisprudential duty analysis. "Although the evolution of 'duty' is still in progress, it is now fair to say that an overwhelming majority of American jurisdictions treat questions of duty in negligence law substantially in terms which I will refer to as the Prosser (Green) approach. The Prosser (Green) approach often appears in American decision law via the policy-based, multi-factor balancing tests made popular largely through several critical California Supreme Court decisions, particularly, *Tarasoff* v. *Regents of the University of Calfornia* [(1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]], *Rowland* v. *Christian* [(1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]], *Dillon* v. *Legg* [(1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]], and *Biakanja* v. *Irving* [(1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]]. American courts have had little use for the relevant sections of the *Restatement (Second) of Torts* when dealing with general or abstract questions of duty; American courts basically prefer Prosser's professed approach . . ." (Lake, *Common Law Duty in Negligence Law: The Recent Consolidation of a Consensus on the Expansion of the Analysis of Duty and the New Conservative Liability Limiting Use of Policy Considerations*

---

[34]"The line-drawing problems are also endemic to relationships built upon dependency." (*Relying Upon the Reasonableness of Strangers*, *supra*, Wis. L.Rev. at p. 886, fn. 77.)

[35]Adler also answers the dissent's rather dismissive reference as "dicta" to the traditional duty analysis employed in *Nally*: "It would have been difficult to predict the result in *Nally* based upon a special relationship analysis. In spite of the *Nally* court's stated reliance on a special relationship analysis, the status of the defendant, the nature of the harm suffered, and the societal burden of imposing liability played a more significant role than did the nature of the relationship that had been established." (*Relying Upon the Reasonableness of Strangers*, *supra*, Wis. L.Rev. at p. 893, fn. 110.)

[36]This approach has been encouraged by others. See Comment, *Washington's Special Relationship Exception to the Public Duty Doctrine*, *supra*, 64 Wash. L.Rev. 401.

(1997) 34 San Diego L.Rev. 1503, 1505, fns. omitted.) We submit, this is precisely the analytical course charted by our Supreme Court in recent years, and the one which we follow. (*Id.* at p. 1533.)

Further, we note that the dissent's argument that the special relationship exception should be interpreted broadly to include affirmative acts that increase a preexisting harm appears to rest primarily on its agreement with the *Mann* court's 20-year-old observation that " 'the law appears to be heading toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence. [Citations.]' [Citations.]" (Dis. opn. of Kline, P. J., *post*, at p. 307, citing *Mann, supra*, 70 Cal.App.3d at p. 780.) In arguing for this expansion, the dissent relies on dated commentary, predicting a legal trend that never actually materialized. In 1983, our Supreme Court firmly shut the door on such predictions when it expressly disapproved *Clemente* v. *State of California* (1980) 101 Cal.App.3d 374 [161 Cal.Rptr. 799], a case which found a special relationship was created between a police officer and an individual citizen based solely on their relationship of dependency. (*Williams, supra*, 34 Cal.3d at pp. 26-27.) In disapproving *Clemente*, the *Williams* court remarked "One might well question whether the drowning man is not similarly dependent on the swimmer on shore; it is settled that there is no legal duty to come to the rescue. [Citations.]" (*Id.* at p. 26, fn. 6, italics omitted.)

Finally, we address the dissent's argument that a duty may be imposed in this case because the responding police officers engaged in actionable misfeasance which increased the risk of harm to Patrick, as opposed to nonactionable nonfeasance. The false expediency of this misfeasance/non-feasance distinction has been persuasively exposed and criticized in recent law review commentary.[37] For example, in Rowe and Silver, *The Jurisprudence of Action and Inaction in the Law of Tort: Solving the Puzzle of Nonfeasance and Misfeasance From the Fifteenth Through the Twentieth Centuries* (1995) 33 Duq. L.Rev. 807 (*The Jurisprudence of Action and Inaction in the Law of Tort*), following an exhaustive examination of cases and legal commentators, the authors conclude that the same challenged conduct may be characterized as either nonfeasance or misfeasance, thus eliminating this distinction as a meaningful way to apply tort doctrine.[38] They observe that the driver who lawfully operates a motor vehicle owes a duty to act reasonably to prevent the vehicle from striking a child who runs

---

[37]Although some California courts have justified their opinions declining to impose a duty of care on police officers by characterizing the conduct involved as nonfeasance, (see, e.g, *Lopez, supra*, 190 Cal.App.3d 678), we believe the scarcity of cases imposing such a duty of care is more readily explained by the policy considerations set forth *post.*

[38]The authors criticized the position taken by Professor Bohlen, concluding: "Bohlen's perspective on misfeasance and nonfeasance seems palpably inadequate to explain the

into the street. Yet the driver's actionable conduct may either be characterized as misfeasance in the operation of the vehicle or nonfeasance because of the failure to brake. (*Id.* at p. 831.)[39]

This same dualism applies to cases examined in this opinion, including *Lopez* and *Mann,* to name only two. The challenged police conduct in *Lopez* may be properly characterized either as nonfeasance (failure to enter the restaurant to defuse the crisis), or misfeasance (employment of the wrong tactical strategy to meet the crisis). In *Mann,* the conduct vis-à-vis the stranded motorists was either the removal of static warnings (misfeasance) or the failure to provide alternative warnings to motorists (nonfeasance).

The facts of this case are equally amenable to such artificial semantics. Rather than characterizing the police conduct as misfeasance (employing a confrontational tactical approach), we could define it as nonfeasance (failing to employ a sensitive approach). However, we decline to resolve this case based on an ambiguous distinction bound to create confusion in application. Instead, we have thoroughly analyzed the existing body of relevant decisional law, weighed the relevant public policy considerations enumerated by our Supreme Court, and concluded that no duty should be imposed under these facts.

For all of these stated reasons, we conclude appellants owed no duty of care to take reasonable steps to prevent Patrick from committing suicide. Because respondents failed to demonstrate the existence of a legal duty—an essential element of a negligence cause of action—the trial court's refusal to grant appellants' motion for nonsuit or directed verdict must be reversed.[40]

## IV.

### DISPOSITION

The judgment for respondents is reversed, and the trial court is hereby directed to enter judgment for appellants. Appellants are awarded costs on appeal. Cross-appeal No. A074965 is dismissed as moot.

Haerle, J., concurred.

---

jurisprudential phenomenon at issue." (*The Jurisprudence of Action and Inaction in the Law of Tort, supra,* 33 Duq. L.Rev. at p. 841.)

[39]Also, as Adler points out, whether a terminally ill patient dies because a physician injects the patient with a substance which hastens death, or the physician simply withholds treatment required to sustain life, the policy question remains unanswered: "Should the physicians speed the death of patients?" It is policy questions, and not simply the characterization of the disputed conduct, that is at the heart of duty analysis. (*Relying Upon the Reasonableness of Strangers, supra,* Wis. L.Rev. at p. 884.)

[40]Due to our determination that appellants owed no duty of care to Patrick or his family, we do not reach appellants' remaining claims of error.

**HAERLE, J.,** Concurring.—I agree completely with both the result and the path by which it is reached in Justice Ruvolo's majority opinion. However, what is *not addressed* in Presiding Justice Kline's dissent leads me to add this brief separate concurrence.

As both of my colleagues demonstrate repeatedly in their opinions, the special relationship doctrine is reserved for situations in which the authorities have created a relationship of "dependency" with a "vulnerable" individual, here of course the decedent. It is for this reason that, at various points in his dissent, Justice Kline references a "situation of dependency" or a "relationship of dependence" allegedly created here. (Dis. opn. of Kline P. J., *post*, at pp. 292, 295, 307.) He also suggests that the police action here amounted to an " 'undertaking to rescue' " by which they " 'voluntarily assume[d] a protective duty' " (*id.* at pp. 292, 310), and that the resulting special relationship triggers a duty to take "affirmative action to assist or protect another." (*Id.* at p. 292.)

All of this and much more in the dissent might lead the unwary reader to suspect that we are dealing with a "vulnerable" and "dependent" victim, e.g., one who was standing on the proverbial ledge of a skyscraper and was allowed to step off the same. We are not. We are addressing the case of a man with a loaded gun who had already discharged that gun in his own household. This crucial, indeed overriding, fact is totally ignored by the dissent. More importantly, though, the explicit proposition in the dissent that, by entering into this situation and trying to disarm the decedent, the police thereby forged a "special relationship" with him constitutes a radical extension of that principle. It should be, I submit, self-evident that a man with a loaded gun is not exactly "vulnerable" and certainly not in a "dependent" relationship with the police who, for the safety of themselves and the community, are trying to disarm him.

**KLINE, P. J.,** Dissenting.—The majority refuses to expose the police to tort liability for what it describes as "inadequate or unreasonable assistance to suicidal individuals" because it believes such liability "could inhibit them from providing intervention at all." (Maj. opn., *ante*, at p. 273.) This conclusion rests on distortions of both the facts and the law.

The conduct of the police in this case was not merely "inadequate" and "unreasonable," but mindlessly reckless. The decedent, shown to be a caring person who never hurt others, suffered periodic bouts of depression and had a drinking problem. Though he possessed a weapon, he had never in the past or at the time of his death used it to threaten others. The decedent had been in his backyard for over an hour before the police found him. A few minutes

after they found him he was killed in a hail of bullets. The officers at the scene did not, as my colleagues claim, merely fail to prevent this death; as the evidence abundantly shows, and the jury found, the death was aggressively provoked. Subjecting the gross misconduct in this case to tort liability will not unduly inhibit law enforcement intervention or burden local government. As the Supreme Court found in an analogous situation, imposing liability will simply "promote careful work." (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352].)

The majority purports to assess only the question of appellants' legal duty. Finding none, it declines to discuss the issue of immunity, which it deems moot. What the majority has really done, however, is to eliminate a duty clearly established in our jurisprudence by creating what amounts to a new form of governmental immunity. This is accomplished not just by overlooking the voluntary assumption of duty in this case but also the many ways in which the conduct of the police created a "special relationship" resulting in a duty to use due care. As a result, the majority has virtually wiped out the special relationship doctrine as it applies to law enforcement officials in a broad class of cases, repudiating the views expressed by the Supreme Court in *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137]. The majority would subject police officers to liability *only* when their conduct "constitutes an intentional tort or a violation of an individual's constitutional or other federally protected rights." (Maj. opn., *ante*, at p. 274.) That is not the law. Moreover, this differential treatment of the police cannot be reconciled with the mandate of the Legislature that "a public employee is liable for injury caused by his act or omission to the same extent as a private person," unless the Legislature has "otherwise provided by statute." (Gov. Code, § 820, subd. (a).)

For the foregoing reasons, I respectfully dissent.

I.

A.

Preliminarily, the majority fails to make it clear that the "duty" at issue here relates not to the reasonableness of appellants' conduct, but whether, as a threshold matter, they had an affirmative duty to prevent respondents' injuries. (On the distinction between these duty analyses, see *Marois* v. *Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 198-199 [208 Cal.Rptr. 384].) Like appellants, the majority does not dispute that, as the jury found, appellants failed to exercise due care and their negligence was the cause of respondents' injury. The majority reasons that the fact that

respondents' injuries were caused by appellants' negligence is beside the point, because the police had no duty to prevent the injuries that occurred.

If by this argument my colleagues mean that the police have no enforceable legal duty to assist persons in danger, I agree. In California, as in virtually all other common law jurisdictions, there is no duty to rescue. As set forth in the Restatement Second of Torts, "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." (Rest.2d Torts, § 314.) "As a general rule one has no duty to control the conduct of another, and no duty to warn those who may be endangered by such conduct." (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193], citing Rest.2d Torts, § 315; *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 751 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; see also 6 Witkin, Summary of California Law (9th ed. 1988) Torts, § 858, p. 220 et seq. and cases there cited; Weinrib, *The Case for a Duty to Rescue* (1980) 90 Yale L.J. 247; Landes & Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism* (1978) 7 J. Legal Stud. 83; and Note (1972) *The Duty to Rescue*, 47 Ind. L.J. 321.)

There are, however, some well-established exceptions to this general rule of no duty, and the genuine question is whether any apply in this case. It is on this issue that my colleagues and I part company, as I believe there are two applicable exceptions.

"First, even when one is not under a duty to act to protect or aid another, if one voluntarily undertakes to do so, he or she will generally be under a duty to exercise reasonable care. Second, a person may in some instances be obligated to take certain affirmative steps to protect or aid another if that person stands in some 'special relationship' to either the person endangered or the person whose conduct may injure the person endangered." (1 Levy et al., California Torts (1998) § 1.10[2], p. 1-42.10, fns. omitted.) As later discussed, these exceptions are much more likely to apply where, as here, the defendant's misfeasance, as opposed to nonfeasance, is the basis of the claim of negligence (*Marois* v. *Royal Investigation & Patrol, Inc., supra,* 162 Cal.App.3d 193, 198); although "negligence may also constitute an omission or failure to act." (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 24, citing *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508].)

California courts have repeatedly held that the absence of a duty to take affirmative action to assist or protect another, no matter how great the danger in which the other is placed, has no application where ". . . there is some *relationship* between them which gives rise to the duty to act." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 858, p. 220, italics in original; see also *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 293 [253 Cal.Rptr. 97, 763 P.2d 948] [". . . we have imposed a duty to prevent a foreseeable suicide only when a special relationship existed between the suicidal individual and the defendant or its agents."].) The imposition of tort liability on the basis of such a "special relationship," or because the duty was voluntarily assumed, has nothing to do with *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], as the majority claims,[1] because that case does not concern exceptions to a general rule of no duty. (See discussion, *post*, at p. 308 et seq.)

As should be apparent, the conduct of the police in this case created a situation of dependency resulting in a "special relationship" between the respondents who sought and obtained their assistance and the decedent on the one hand and appellants on the other. The imposition of liability is, however, independently justified by the voluntariness of the police assumption of duty and the manner in which the police on the scene exacerbated the peril that previously existed.

Section 323 of the Restatement Second of Torts provides as follows: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if [¶] (a) *his failure to exercise such care increases the risk of such harm*, or [¶] (b) the harm is suffered because of the other's reliance upon the undertaking." (Rest.2d Torts, § 323, italics added.) The fundamental idea is that ". . . the undertaking to rescue, although not required, gives rise to the duty to exercise care not to leave the object of the rescue in worse condition than if the rescue had not been attempted." (3 Harper et al., The Law of Torts (2d ed. 1986) § 18.6, p. 722.)

---

[1]I acknowledge that a few courts have applied the *Rowland* v. *Christian* analysis to determine whether the police have a responsibility to provide assistance. (See, e.g., *Dutton* v. *City of Pacifica* (1995) 35 Cal.App.4th 1171 [41 Cal.Rptr.2d 816]; *Allen* v. *Toten* (1985) 172 Cal.App.3d 1079 [218 Cal.Rptr. 725] and *Shelton* v. *City of Westminster* (1982) 138 Cal.App.3d 610 [188 Cal.Rptr. 205].) Those cases were, in my view, erroneous in that respect, although, as later explained, appellants would not be relieved of liability even if *Rowland* did apply. (See discussion, *post*, at fn. 10.) The discussion of *Rowland* in *Nally* v. *Grace Community Church, supra,* 47 Cal.3d at pages 296-299, was dicta, as the court previously found no "special relationship" in that case, which it indicated was the dispositive consideration. (*Id.*, at p. 293.)

Application to the police of the legal principle embodied in section 323 of the Restatement Second of Torts, and the connection between that principle and the "special relationship" doctrine is best illustrated by *Williams* v. *State of California, supra*, 34 Cal.3d 18, even though the court found in that case that the plaintiff had failed to satisfactorily state a cause of action. The plaintiff in *Williams* was injured when a piece of a heated brake drum from a passing truck was propelled through the windshield of her automobile. She alleged that the police officers who arrived at the scene and investigated the accident negligently failed to test the brake drum part to determine whether it was still hot, failed to secure the identity of witnesses, and failed to attempt pursuit of the owner of the truck, virtually destroying the plaintiff's ability to obtain compensation for her injuries and damages. The trial court granted the state's motion for judgment on the pleadings. The Supreme Court reversed.

The court first observed that the state highway patrol has the right but not the duty to investigate accidents, or to come to the aid of stranded motorists. (34 Cal.3d at p. 24.) The chief issue in *Williams* was whether a legal duty could nonetheless be imposed because, by intervening in the situation, the police assumed the responsibility to act reasonably in the circumstances and thereby created a "special relationship." The court stated that, "although 'no special relationship may exist between members of the California Highway Patrol and the motoring public generally, or between the Patrol and stranded motorists generally' [citation], *when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization.* [Citations.] [¶] The breach of duty may be an affirmative act which places the person in peril or increases the risk of harm as in *McCorkle* v. *Los Angeles* (1969) 70 Cal.2d 252 . . . , where an officer investigating an accident directed the plaintiff to follow him into the middle of the intersection where the plaintiff was hit by another car. The negligence may also constitute an omission or failure to act, as in *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 . . . , where a deputy sheriff promised to warn a decedent if a prisoner, who had made threats on her life, was released. The county was held liable when the sheriff failed to warn." (*Ibid.*, italics added.)

The *Williams* court cited *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82], as an example of a case in which a special relationship was based on such dependency. In that case, "[h]ighway patrolmen, coming to the aid of a stranded motorist, placed their car with flashing lights behind two cars stalled on the freeway. After calling the tow truck, the officers withdrew without warning; they did not wait for the tow truck to

line up behind the stalled car or provide the alternative protection of flares. Minutes later the stalled car was sideswiped by a passing car and the persons nearby were injured." (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 25.) The crucial factors in *Mann,* according to the *Williams* court, were that ". . . the officers' conduct contributed to, increased, and changed the risk which would have otherwise existed. They stopped to investigate and they took affirmative steps to provide assistance, lulling the injured parties into a false sense of security and perhaps preventing other assistance from being sought." (*Ibid.*)

Applying well-established principles, the Supreme Court concluded in *Williams* that the plaintiff there failed to establish a duty of care owed by the police officers who arrived at the scene, because the officers "took no affirmative action which contributed to, increased, or changed the risk which would have otherwise existed; there is no indication that they voluntarily assumed any responsibility to protect plaintiff's prospects for recovery by civil litigation; and there are no allegations of the requisite factors to a finding of special relationship, namely detrimental reliance by the plaintiff on the officers' conduct, statements made by them which induced a false sense of security and thereby worsened her position." (34 Cal.3d at pp. 27-28, fn. omitted.) (However, the Supreme Court directed the trial court to permit the plaintiff to file an amended complaint in light of the lower court's misperception of the legal question presented, and since it could not be said the plaintiff could never state a cause of action. (*Id.,* at p. 28.))

The situation in the present case is, of course, completely different from that in *Williams.* The officers here—who, unlike the police in *Williams,* were witnessing the commission of felonies dangerous to human life (Pen. Code, §§ 417, subd. (c), 417.8)—immediately asserted almost complete control over the situation, thereby limiting respondents' ability to deal with it themselves or take other measures.

Although five other officers were already there, Sergeant Osawa's first act was to request additional units. Without requesting permission, Osawa and three other officers, all of whom had their weapons drawn, cocked and ready to be fired, searched the house, refusing to permit respondents to enter the premises. Finding nothing in the house, the officers turned their attention to the backyard. Osawa loudly identified himself and his colleagues as Fremont police, twice called out Patrick's name, and ordered him to come out with his hands in the air. When Patrick was found sitting under a bush with a gun pointed at himself, Sergeant Osawa never considered even temporarily withdrawing. Nor, despite the fact he had no training in negotiations with disturbed persons, did Sergeant Osawa then consult Officer Tajima-Shadle,

who had such training and was on the scene. Osawa also declined to invite respondents or others friendly to Patrick to participate in their efforts to induce him to put down his weapon, which respondents' experts testified was the appropriate course. Instead, the officers flipped a picnic table on its side, knelt behind it for protection, and again directed Patrick to come out with his hands up. Sergeant Osawa then threatened to send in a police dog if Patrick did not immediately comply with his order. When Patrick remained silent, officers released the dog, commanded it to search, and followed the dog toward Patrick with weapons drawn. When they saw Patrick sitting with a gun cradled in his arms and pointed at his chest, the officers directed him to "Freeze," and "Drop the gun." After the dog became excited and continued barking loudly, Patrick uttered his first words: "Get the fucking dog out of here" and "What are you going to do, fucking shoot me?" The officers then went back behind the picnic table. One of the officers then went back to Patrick, pointed a shotgun at him, and started talking. Other officers in the backyard and at the windows of the residence had guns drawn and were pointing searchlights at Patrick, so he would be unable to see them. Several officers testified they had decided to shoot Patrick if he made any moves they considered threatening. During this time Patrick kept saying, in effect, "Leave me alone. Get out of my yard. I don't want to talk to you."

Sergeant Osawa then directed Officer Lopes to leave his station in the adjacent backyard, because he might get caught in a crossfire. About a minute later, at a time when eight officers had weapons pointed at Patrick, thirty-four shots were fired over a period of from five to ten seconds. Patrick's body was pierced by 27 bullets, one of which came from his own gun. At all material times, respondents were restrained by the police from entering the backyard to intervene, as respondent Adams attempted to do.

By this conduct the police controlled the environment of the threatened suicide as completely as was possible. Respondents, who had been excluded from the premises and compelled to rely upon Sergeant Osawa and the numerous officers he was commanding, were not in a position to tell the police to leave and try to deal with Patrick themselves, solicit the intervention of friends, or simply do nothing and hope Patrick would recover his senses, as he had in the past. The peremptory assertion of such total control over the situation by the police, and the exclusion of respondents from any meaningful role in the attempt to dissuade Patrick from harming himself, clearly created the "situation of dependency" described by the Supreme

Court in *Williams* v. *California, supra,* 34 Cal.3d at page 25, which "results in detrimental reliance [on the police] for protection." (*Ibid.*)[2]

Not only did the police create a situation of dependency, which would be enough, as in *Mann* they also took affirmative action materially increasing the risk that previously existed. In addition, they changed the nature of the risk that previously existed by creating the possibility Patrick might be injured or killed by the police, or provoked into killing himself.

The evidence which most devastatingly establishes that the police significantly increased the risk of harm in this case was the testimony of respondents' experts. Peter Reedy, a retired police officer trained by the FBI, who taught crisis management and been involved in "sixty to eighty" negotiations in hostage and suicide incidents involving persons under the influence of alcohol or drugs, testified at considerable length. In his view, Sergeant Osawa violated virtually every relevant law enforcement protocol, including those of the Fremont Police Department. By threatening the use of deadly force much too precipitiously and aggressively, the police dangerously increased the level of anxiety and tension, which is the opposite of what proper police practice calls for. This testimony was buttressed by that of Dr. Robert E. Litman, who specializes in the study of suicide prevention and

---

[2]In a footnote, the majority takes issue with respondents' statement at oral argument (in response to a question from the court) that the detrimental reliance requirement can be satisfied by decedent's wife and stepdaughter's reliance on the responding officers for assistance, and the officers' refusal to permit familial participation in the situation. The majority claims this "contention" cannot now be made because it "was not properly raised in respondents' appellate brief." (Maj. opn., *ante*, at p. 281, fn. 29.) This statement is wholly unjustified. The rules of pleading certainly do not require such specificity; moreover, appellants never challenged the pleadings on this or any other ground, and do not now raise the matter on appeal, which is, of course, why respondents did not bother to address the issue in their reply brief.

Also unjustified is the majority's assertion that there is "no evidence that [Patrick's wife and stepdaughter] detrimentally relied on the conduct of the police officers by foregoing other means of assisting Patrick." (Maj. opn., *ante*, at p. 281, fn. 29.) The evidence showed that Sergeant Osawa failed to inquire of Patrick's wife and stepdaughter about the cause of his conduct, whether he had been using drugs or drinking and, if so, how he responded to such substances, whether he had a criminal history, or a history of past violent acts, or an aggressive or passive personality, or disliked the police, or had an aversion to dogs, or anything else that might shed light on his behavior and attitudes. Respondents' experts testified that the failure to obtain this information—which respondents sought to provide—significantly diminished the ability of the police to respond intelligently to the situation, and thereby contributed to Patrick's death. Furthermore, the wife and stepdaughter testified that the police placed them under strict constraints, establishing their inability to personally intercede, seek assistance from decedent's friend Alan Kirshner (as one expert thought appropriate) or others, or see to it that Patrick remained undisturbed until he sobered up. The special interrogatories received from the jury indicate that the verdict was based in part on this evidence; we are therefore not free to ignore it, or to speculate as to how jurors could have interpreted the pertinent evidence.

lectures to law enforcement agencies. Dr. Litman explained at length why, in his opinion, "the police were a major cause, a substantial cause [of Patrick's suicide.]"

There can be no doubt that the jury accepted the testimony of respondents' experts and rejected the opposing views of Joseph Callahan, a "consultant" with associate of arts degrees in "mortuary science" and "police science" who "lectures to police and military groups on issues of tactics," and Dr. Donald Lunde, a psychiatrist, who testified in behalf of appellants. The jury specified 13 ways in which Sergeant Osawa and his "SWAT" team unnecessarily inflamed the situation, increasing the danger Patrick might shoot himself and creating the new and different danger that he might unnecessarily be shot by the police: "[1] Lacked control of the officers. [2] Insufficient communications. [3] Lack of information. [4] Did not respond to suicide call as such. It was an assault response rather than assist. [5] Did not follow Fremont Police Dept. procedures for dealing with a critical incident. [6] Delayed calling in medical help. [7] Decision to use dog prior to using a negotiator. [8] Allowed untrained officers to attempt negotiation. [9] Did not evacuate all the neighbors. [10] Did not maintain the psychological sanctity of the family members at the scene. [11] The use of 7 armed officers left no option but force. [12] Once location of Pat was known, did not back down to allow calming of situation. [13] Yelling and shouting at Pat did not allow for calm."

The majority unjustifiably attempts to brush this evidence aside. Claiming that the question of duty presents a pure "question of law to be determined by the court alone" (maj. opn., *ante*, at p. 265), the majority initially takes the position that the most important factual findings are irrelevant. According to the majority, we would "abdicate our distinct role" if we considered either "the inapposite findings of the jury" or the "testimony of respondents' expert witnesses, who testified that the police caused Patrick's suicide and violated the applicable standard of care by increasing the anxiety level at the scene or rushing the situation." (*Ibid.*) By thus conveniently eliminating consideration of the findings and evidence which most powerfully shows that the conduct of the police created a "special relationship," the majority concludes there was no such relationship and therefore no duty. But the facts cannot so easily be dismissed.

Legal rules are no more than conditional statements referring to supposed facts. The Restatement Second of Torts declares, for example, that the word "duty" is used "to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any

injury sustained by such other, of which the actor's conduct is a legal cause." (Rest.2d Torts, § 4, p. 7.) The purely legal rule, which defines the "particular manner" in which an actor must ordinarily conduct himself, does not, however, always fully determine the existence of a duty. Whether the duty exists depends in part upon whether the actor conducted himself in the appropriate manner, which is, of course, a factual question. Thus, as has been stated, "[t]he duty issue frequently poses questions of the kind usually given to the jury. Under the prevailing rule duty to use due care is bounded by the foreseeable range of danger. Reasonable foreseeability of harm is the very prototype of the question a jury must pass on in particularizing the standard of conduct in the case before it." (3 Harper et al., The Law of Torts, *supra*, § 18.8, p. 744.)[3] Moreover, ". . . the question of foreseeability always involves more than the determination of simple facts—i.e., what the parties did or did not do, and what the surrounding circumstances were. It also involves a determination of what the parties *should have perceived* under those circumstances, i.e., whether the reasonably prudent person in the shoes of [the] party would have recognized unreasonable danger *to* the plaintiff *from* the source of harm or hazard that befell him. Within broad limits . . . this question is generally also one for the jury. [¶] The Restatement [Second of Torts] clearly recognizes that the jury may be called [upon] to make evaluations as well as to find simple facts—to decide what the parties *should* have done as well as what they *did* do." (*Id.*, at p. 747, italics in original, citing Rest.2d Torts, § 323C.)

The question of duty cannot be resolved in this case without resort to both the facts of the situation in which the parties found themselves and an evaluation of what the police on the scene should have perceived and should have done in the context of that situation.

As we have seen, the "special relationship" which gives rise to a duty may be created when police conduct "contributed to, increased, or changed the risk which would have otherwise existed." (*Williams* v. *State of California*, *supra*, 34 Cal.3d at p. 27.) The evidence which most clearly shows what the police did or did not do in this case, the dangers they should have perceived, and the action, if any, they should have taken—all of which relate to whether

---

[3]The author of this treatise acknowledges the argument "that it is impossible in the nature of things for the duty problem to be decided by the jury, for if the court sends the issue to the jury this 'necessarily operates as a ruling that there is a duty or else he would never have submitted the case to the jury at all.' " The author rejects this argument because, "[a]s in the case of any other issue, the judge will leave the question to the jury if it is a debatable one, but the jury may decide that (for example) plaintiff was beyond the apparent scope of danger from defendant's conduct, and so beyond the scope of the duty to perform it carefully, even where they are quite ready to find defendant's conduct clearly below the standard of reasonable care." (3 Harper et al., The Law of Torts, *supra*, § 18.8, pp. 744-745.)

the police unreasonably contributed to, increased or changed the preexisting risk, and therefore bear upon the question of duty—consists primarily of the testimony of the experts. The trial court acknowledged that the question of duty could not be resolved without a jury determination of these factual questions. So too did appellants, who never made any objection to the presentation of these issues to the jury. Nor did appellants ever object to the receipt in evidence of the testimony of the experts. The refusal of the majority to consider this testimony in connection with the question of duty, and to defer to the factual determinations made by the jury, which are supported by substantial evidence, is altogether unjustifiable.[4]

Equally unjustifiable is the majority's assumption that a special relationship cannot be created without the collective presence of *all* of the factors which under *Williams* can create a "special relationship." For example, allowing that "the officers' conduct arguably increased the preexisting risk that Patrick would commit suicide, it did not change the preexisting risk that Patrick would do so." (Maj. opn., *ante*, at p. 284.) In other words, according to the majority, the volunteered assistance of the police in this case must not only increase the preexisting risk but *also* change the nature of the preexisting risk *and* there must be detrimental reliance on the police conduct by the plaintiff. As indicated, I believe all these factors are present in this case, though the presence of only one would be sufficient to create a "special relationship."

Citing section 323 of the Restatement Second of Torts, the Supreme Court explained in *Williams* that one who voluntarily comes to the aid of another "is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, *or* (b) the harm is suffered because of the other's reliance upon the undertaking." (*Williams* v. *State of California, supra*, 34 Cal.3d at p. 23, italics added.) In other words, it is sufficient if the actor either increases the risk (as by exacerbating a danger that already existed or creating a new danger) or the harm results from the plaintiff's detrimental reliance on the assistance (as by foreclosing other forms of assistance). The fact that the *Williams* court found that none

---

[4]The majority alternatively justifies its indifference to the evidence that bears most directly on the question of duty by claiming that the problem is in the pleadings. For example, conceding that a "special relationship" may be established without an express or implied promise, the majority considers it fatal that respondents failed to "plead and prove that police conduct in a situation of dependency lulled [them] into a false sense of security, thereby inducing [their] detrimental reliance on the police for protection." (Maj. opn., *ante*, at p. 282.) What the majority overlooks, however, is that appellants never asserted a defect in the pleadings prior to trial, when that issue should have been raised and any defect could have been cured by amendment (see *Williams* v. *State of California, supra*, 34 Cal.3d at p. 28), nor did they make such a claim at any other time either in the court below or now on this appeal. Any technical defect in the pleadings was waived.

of the factors that can create a "special relationship" were present in that case does not suggest, as my colleagues believe, that all are necessary. As one authority has pointed out, the courts in *Williams* and *Mann* justify the imposition of a duty under the "special relationship" doctrine where "an individual officer had commenced a protective undertaking, and by his or her conduct *either* increased the risk to which the citizen was exposed during that episode, *or* induced the citizen to forego taking protective measures during the episode because the officer was apparently providing such limited protection."[5] (5 Levy et al., California Torts, *supra*, § 60.41 at p. 60-34.4, italics added.)

The majority is wrong in suggesting that the Supreme Court altered its attitude about the special relationship doctrine when in *Williams* it expressly disapproved *Clemente* v. *State of California* (1980) 101 Cal.App.3d 374 [161 Cal.Rptr. 799]. (Maj. opn., *ante*, at p. 287.) Reaffirming the special relationship doctrine, the *Williams* court disapproved *Clemente* simply because unlike *Mann* (and the present case), where the police had actually "undertaken to protect the [injured party] from future physical harm," the police in *Clemente* simply failed to investigate the cause and source of harm that had already occurred. (*Williams* v. *State of California, supra*, 34 Cal.3d at p. 26.)

In sum, even if (contrary to *Allen* v. *Toten, supra*, 172 Cal.App.3d 1079, 1090), appellants were Good Samaritans without any responsibility to enmesh themselves in the situation in the first place (as *Williams* compels me to conclude),[6] their conduct in this case exposed them to liability because they voluntarily assumed responsibility to assist respondents and the decedent and their conduct substantially increased the preexisting risk. The fact that appellants' conduct also changed the nature of the risk that already existed and compelled respondents to rely on their expertise is simply additional reason to find that a "special relationship" had been created.

---

[5]It is on the basis of its erroneous belief that not just one but all of the foregoing factors must be present in order to create a "special relationship" that the majority attempts to distinguish this case from *Mann* v. *State of California, supra*, 70 Cal.App.3d 773. According to the majority, the "cornerstone" of *Mann* "was not simply police conduct that increased a preexisting risk of harm. Rather, the Supreme Court's approval of the result in *Mann* rested on a variety of factors including: (1) police conduct that not only contributed to and increased the preexisting risk, but also *changed* the risk that would otherwise have existed; (2) the motorists' situation of dependency; (3) the motorists' detrimental reliance on the officers' conduct that prevented them from seeking other assistance; and (4) the fact that the officers' conduct lulled the motorists into a false sense of security." (Maj. opn., *ante*, at p. 284, italics in original.) The majority's belief that these factors must all be present, and that a "special relationship" cannot be created by any one of them is, as we have seen, contradicted by the opinion in *Williams* and by virtually all the other authorities.

[6]But see Justice Mosk's dissent in *Williams* v. *State of California, supra*, 34 Cal.3d at pages 28-30, concluding that the highway patrol officer in that case had a duty to assist the plaintiff and could not be considered a Good Samaritan.

The majority also says this case is different from *Mann* and other cases finding that the conduct of the police created a special relationship imposing a duty of care (i.e., *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453]; *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113]; *Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298 [191 Cal.Rptr. 704]) because, unlike the situations in those cases, ". . . the responding officers made no express or implied promises that they would prevent Patrick's suicide or that they would approach Patrick in a nonconfrontational manner." (Maj. opn., *ante*, at p. 281.) The short answer to this objection is that, as emphasized by the Supreme Court in *Williams*, a "special relationship" can be created by conduct even without a promise and reliance thereon. "Such a relationship has also been found," the court stated, "when the *conduct* of a police officer, in a situation of dependency, results in detrimental reliance on him for protection." (*Williams* v. *State of California, supra*, 34 Cal.3d at p. 25, italics in original.)

The "situation of dependency" and resultant reliance on the police officers at the scene, by respondents as well as by the decedent, is much more clearly established by the evidence in this case than in the cases the majority relies upon. The control asserted by the police here also distinguishes this case from *Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278, which addressed the duty of nontherapist counselors and a religious organization, not police officers. The *Nally* court observed that ". . . we have imposed a duty to prevent a foreseeable suicide only when a special relationship existed between the suicidal individual and the defendant or its agents." (*Id.*, at p. 293.) The court noted, as examples, cases in which such a duty was imposed on physicians or hospitals "after plaintiffs proved that the deceased committed suicide in a hospital or other in-patient facility that had accepted the responsibility to care for and attend to the needs of the suicidal patient." (*Ibid.*, citing *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519] and *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193].) The *Nally* court refused to extend that duty of care "to personal or religious counseling relationships in which one person provided nonprofessional guidance to another seeking advice *and the counselor had no control over the environment of the individual being counseled.*" (*Nally, supra*, at p. 294, italics added.) The *Nally* court distinguished *Meier* and *Vistica* because unlike those cases, the plaintiff in *Nally* was not sufficiently under the control of the defendant, and the defendant did not fully accept responsibility: "Nally was not involved in a supervised medical relationship with defendants, and he committed suicide well over two weeks after he was released from the hospital against the advice of his attending psychiatrist and physician." (*Nally, supra*, at p. 294.)

The total control over Patrick the police exercised at all material times, which exceeded even the level of control found sufficient by the Supreme Court to justify the imposition of duty in *Meier* and *Vistica*, clearly distinguishes this case from *Nally*, even apart from the fact that we are dealing in this case with the duty of police officers, not personal or religious counselors.

This case is different from *Nally* (and the other cases the majority relies upon) in yet another important way. Respondents do not predicate liability upon appellants' failure to intervene to save Patrick, but rather upon their affirmative acts that increased the preexisting risk, as respondents' experts testified.

The majority correctly points out that "[a] long line of cases has held that a special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene." (Maj. opn., *ante*, at p. 279, citing *Williams* v. *State of California, supra,* 34 Cal.3d 18; *M.B.* v. *City of San Diego* (1991) 233 Cal.App.3d 699 [284 Cal.Rptr. 555]; *Lopez* v. *City of San Diego* (1987) 190 Cal.App.3d 678 [235 Cal.Rptr. 583]; *Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111 [222 Cal.Rptr. 239]; *Shelton* v. *City of Westminster, supra,* 138 Cal.App.3d 610.) The police in the present case did not, however, merely respond to a call for assistance and take some inconsequential action which could not reasonably have induced reliance or otherwise created a special relationship. As described, the police not only preemptively asserted complete control, but initiated extreme measures involving the use of automatic weapons, guard dogs and searchlights, all of which were employed in a particularly aggressive manner and in violation of protocols of the Fremont Police Department. This conduct significantly increased the risk of harm, not just to Patrick, but to others, including the police themselves.

Throughout its opinion the majority describes the increase in the risk created by the police as merely "incremental." Thus, for example, it says that "no authority exists imposing a duty [under the special relationship doctrine] where police conduct only incrementally increased the risk to which the injured person was already exposed." (Maj. opn., *ante*, at p. 284.) The word "incremental" is notably inexact. If my colleagues used that term to refer to increases in risk that are insignificant I would agree. But that is clearly not their intent, as the increase in the risk of harm created by the conduct of the police in this case, to which they refer, is anything but insignificant. To be sure, the case law does not with precision mark the degree to which a person who volunteers assistance must increase preexisting risk in order to be liable under the special relationship doctrine. But if the degree to which appellants' conduct increased the risk in this case is insufficient it is hard to imagine any

increase in the risk of harm caused by noncriminal conduct that would suffice. As I have said, the majority's assertion that there is "no evidence" that appellants acted with "reckless indifference to the consequences of their actions" (maj. opn., *ante*, at p. 271)—which is the foundation of the majority opinion—unjustifiably rejects findings of the trier of fact amply supported by the evidence. Indeed, the majority not only ignores certain critical findings of the jury but contradicts them. Thus, for example, ignoring the specific finding of the jury that the conduct of the police constituted " 'an assault response rather than [an] assist' " (maj. opn., *ante*, at p. 260), the majority contends that the "assaultive" party was not the police but Patrick (maj. opn., *ante*, at p. 270), so that he should bear 100 percent of the fault, not just the 25 percent determined by the jury.

My colleagues are simply unwilling to accept the determination of the jury that the danger to the police was more the result of their own conduct than that of Patrick. For example, the majority's assertion that ". . . the majority of the disputed conduct in this case was the product of Sergeant Osawa's deliberate tactical decisions designed to maximize the safety of the responding officers" (maj. opn., *ante*, at p. 276) conflicts with the extensive expert testimony—never objected to by appellants and accepted by the trier of fact—that Osawa's conduct did not protect the safety of anyone and unnecessarily created the very danger (to the police themselves as well as to Patrick and others) the majority unfairly uses to exonerate Osawa. As earlier noted, Patrick had been sitting in the backyard for over an hour prior to the arrival of the police, during which time the effects of the alcohol he had earlier consumed was diminishing. As respondents' experts persuasively explained, the danger to Patrick and others during that time was far less than that created by the arrival and provocations of Sergeant Osawa's SWAT team.

While I certainly agree with my colleagues that there is a "social value of protecting the lives of police officers involved in a standoff with an armed individual" (maj. opn., *ante*, at p. 276), I do not understand how the social value of protecting the police is advanced by refusing to impose liability on law enforcement officers whose unreasonable conduct unnecessarily endangers themselves (as well as those they purport to assist). Furthermore, as requested by appellants' counsel, the trial court specifically instructed the jury that in situations involving threatened suicides the highest interest of the police is the protection of "[t]he physical safety of the community, *including themselves*, other citizens and family members."[7] (Italics added.) The jury must therefore be deemed to have taken this factor into consideration when it nonetheless rendered its verdict against the police.

[7]The instruction was taken from language in the opinion in *Allen* v. *Toten, supra,* 172 Cal.App.3d 1079, 1089.

It is also important to remember that the jury did not find the police wholly responsible for Patrick's death, as it assigned 25 percent of the responsibility to Patrick's own conduct, holding appellants responsible only for the remaining 75 percent.

In short, it is simply untrue that, as the majority claims, "imposing liability for the negligent handling of a threatened suicide improperly elevates the interests in preserving the life of the person threatening suicide over the interests of public safety and the physical safety of police officers." (Maj. opn., *ante*, at p. 272.) The finder of fact in this case was asked to and presumably did take into account the factors my colleagues think can be considered only by constricting the legal duty of the police.

## B.

Although the distinction between misfeasance and nonfeasance is sometimes tenuous, that is not true in this case. The majority ignores the significance our law attaches to this distinction.

As Professor Francis S. Bohlen pointed out in his classic 1908 essay on the duty to aid others, misfeasance differs from nonfeasance not only with respect to the character of the conduct complained of but as well "in the nature of the detriment suffered in consequence thereof." (Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability* (1908) 56 U. Pa. L.Rev. 217, 220.) Bohlen explained that the difference between the results of nonfeasance and misfeasance, while "fundamental," is not obvious. "In the case of active misfeasance the victim is *positively worse off* as a result the wrongful act. In cases of passive inaction plaintiff is in reality no worse off at all. His situation is unchanged; he is merely deprived of a protection which, had it been afforded him, would have benefited him. In the one case the defendant, *by interfering with plaintiff or his affairs, has brought a new harm upon him, and created a minus quantity, a positive loss*. In the other, by failing to interfere in the plaintiff's affairs, the defendant has left him just as he was before; no better off, it is true, but still in no worse position; he has failed to benefit him, but he has not caused him any new injury nor created any new injurious situation. There is here a loss only in the sense of an absence of a plus quantity. It is this latter difference which in fact lies at the root of the marked difference in liability at common law for the consequences of misfeasance and non-feasance." (*Id.*, at pp. 220-221, italics added.)

The majority's indifference to the affirmative nature of appellants' unreasonable conduct is evident in its attempted analogy to certain other cases

involving suicide. Citing *Nally* and two out-of-state cases (*Lee* v. *Corregedore* (1996) 83 Hawaii 154 [925 P.2d 324] and *Donaldson* v. *YMCA* (Minn. 1995) 539 N.W.2d 789, 792), the majority says that "[i]n cases involving suicide, courts have been extremely reluctant to impose liability based on the special relationship exception." (Maj. opn., *ante*, at p. 277.) The cases the majority relies upon for this statement all involved acts of omission or nonfeasance, however, not unreasonably aggressive and unduly provocative acts of the sort that occurred in this case.

Cognizant that the distinction our Supreme Court has drawn between misfeasance and nonfeasance conflicts with its analysis, the majority ends up dismissing the distinction as merely "semantic," because the same challenged conduct can almost always be characterized as either nonfeasance or misfeasance. (Maj. opn., *ante*, at p. 288.) The majority says, for example, that the conduct of the police in this case could be characterized as nonfeasance rather than misfeasance by describing it as the mere "fail[ure] to employ a sensitive approach." (*Ibid.*) This is, of course, sophistry.

Though the significance of the misfeasance/nonfeasance distinction has been repeatedly acknowledged by our Supreme Court (see, e.g., *Williams* v. *State of California, supra*, 34 Cal.3d 18, 23; *Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425, 435, fn. 5), my colleagues are correct that the distinction has been subjected to criticism. (See, e.g., 3 Harper et al., The Law of Torts, *supra*, § 18.6, p. 712 et seq.) But the burden of the criticisms is *not* that the distinction unjustifiably supports the imposition of liability for affirmative acts—which is the reason the majority dismisses it—but that the distinction may sometimes unjustifiably insulate a defendant from liability for the failure to act.[8] Moreover, none of the commentators critical of the distinction urge that it be replaced by an analysis which would assist appellants. Consider, for example, the law review article upon which the majority relies. (Rowe & Silver, *The Jurisprudence of Action and Inaction in the Law of Tort: Solving the Puzzle of Nonfeasance and Misfeasance From the Fifteenth Through the Twentieth Centuries* (1995) 33 Duq. L.Rev. 807.)

---

[8]This is not a problem in California, however, because our Supreme Court has declared that "an omission or failure to act" may constitute a breach of duty. (*Williams* v. *State of California, supra*, 34 Cal.3d at p. 24.) For example, in *Soldano* v. *O'Daniels* (1983) 141 Cal.App.3d 443 [190 Cal.Rptr. 310, 37 A.L.R.4th 1183], the court recognized the possibility of liability for the wrongful death of a murder victim where the defendant bartender refused to permit the use of a public telephone to summon police help, when the victim was seen to be violently threatened. The distinction between misfeasance and nonfeasance remains important in this jurisdiction only because the imposition of liability is more likely in cases in which the defendant's conduct consists of an affirmative act rather than a failure to act. (See *Marois* v. *Royal Investigation & Patrol, Inc., supra*, 162 Cal.App.3d 193, 198.)

The authors of that article complain that the misfeasance/nonfeasance distinction has been used "in a mindless, mechanical manner to countenance the statement that nonfeasance, which it equates with inaction, raises no liability." (*The Jurisprudence of Action and Inaction in the Law of Tort: Solving the Puzzle of Nonfeasance and Misfeasance From the Fifteenth Through the Twentieth Centuries, supra*, 33 Duq. L.Rev. at p. 808, fn. omitted.) Analyzing two famous Cardozo opinions involving notions of nonfeasance and misfeasance,[9] they state that Cardozo would distinguish an actionable negligent omission from inactionable nonfeasance "by reference to this question: Did the defendant's action go forward to such a stage that inaction would produce an affirmative injury as opposed to the denial of a benefit? If the answer is 'no,' the defendant is an innocent nonfeasor. If it is 'yes,' then he might be a negligent misfeasor, depending, of course, on the prudence or imprudence with which the defendant acted." (*Id.*, at p. 839.)

The article goes on to make clear its repudiation of the view adopted by my colleagues in this case. While the article maintains that the misfeasance/nonfeasance distinction is overly simplistic and has created confusion, it also contends that the distinction reflects a legitimate concern that could be better expressed. According to the authors of the article, the many courts that have employed the misfeasance/nonfeasance distinction "seem always to have been reaching for this proposition: One is duty bound to behave prudently only with respect to such risks as are attributable to him. They have been asking, *sub silento*, this simple question: Absent the defendant's existence as a person (or entity), would the plaintiff have nonetheless suffered the damage of which he complains? If the answer is yes, (although this question can only be asked unconsciously) then the risk through which the plaintiff was damaged cannot be attributable to the defendant and the defendant is a nonfeasor only. In such cases, the damage may well be caused by the defendant's behavior—his failure to act—which proposition is easily established by reference to a second question: Absent the defendant's failure to act, would the plaintiff have nonetheless suffered the damage of which he complains? The answer to that question might easily be 'no'—which means that the defendant's failure to act has caused the damage at issue—even as the answer to the question previously asked is yes." (*The Jurisprudence of Action and Inaction in the Law of Tort: Solving the Puzzle of Nonfeasance and Misfeasance From the Fifteenth Through the Twentieth Centuries, supra*, 33 Duq. L.Rev. at p. 851.) In other words, "[a]ction and omission may both be negligent, but one has a duty to refrain from negligence only as to those risks created by one's existence on earth." (*Id.*, at p. 854.)

A duty arises in this case under the foregoing tests even if (as is not the case) the conduct in this case could be considered a "not doing" rather than

[9]*MacPherson v. Buick Motor Co.* (1916) 217 N.Y. 382 [111 N.E. 1050] and *H. R. Moch Co. v. Rensselaer Water Co.* (1928) 247 N.Y. 160 [159 N.E. 896, 62 A.L.R. 1199].

a "misdoing." Appellants affirmatively intervened in the situation to such an extent that their negligent "omissions" produced affirmative injury, not merely the denial of a benefit, and their conduct was manifestly imprudent. Moreover, respondents' experts provided evidence that this conduct was "a substantial cause" of Patrick's death. Stated differently, absent appellants' existence, the decedent's body would not have been riddled with 27 bullets, and his survival far more likely, if not certain.

The basic idea was explained less elaborately in *Williams* v. *California, supra,* 34 Cal.3d 18, where the Supreme Court stated that "[a]bsence of duty [rather than statutory immunity] is a particularly useful and conceptually more satisfying rationale where, *absent any 'special relationship'* between the officers and the plaintiff, *the alleged tort consists merely in police nonfeasance.* [Citations.]" (*Id.,* at p. 23, italics added.) By the same token, absence of duty is commensurately *inappropriate* in cases such as this, where the special relationship results, inter alia, from police misfeasance.

## C.

The majority takes me to task for urging an expansion of the special relationship doctrine. Claiming I rely on "dated commentary," they say I am "predicting a legal trend that never actually materialized." (Maj. opn., *ante,* at p. 287.) This is demonstrably untrue. The expansion the majority abhors occurred in this and most other American jurisdictions long ago. As noted by our Supreme Court more than 20 years ago, this expansion was the salutary judicial response to the moral problem created by the absence in the law of a duty to rescue. In *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425, the high court observed that the general common law rule that a person owes no duty to control the conduct of another "derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter. [Citation.] Morally questionable, the rule [of no liability for nonfeasance] owes its survival to 'the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue . . . .' [Citation.] Because of these practical difficulties, *the courts have increased the number of instances in which affirmative duties · are imposed not by direct rejection of the common law rule, but by expanding the list of special relationships which will justify departure from that rule.* [Citation.]" (*Id.,* at p. 435, fn. 5, italics added; accord, 3 Harper et al., The Law of Torts, *supra,* § 18.6, pp. 712-732, and authorities there cited and discussed.) As pointed out in *Mann* (which, as earlier noted, was cited with approval by the Supreme Court in *Williams*), "The California Supreme Court, Prosser and the Restatement Second of Torts all recognize that 'special relationship' is

an expanding concept in tort law. (See *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 435, fn. 5; Prosser, *Law of Torts* (4th ed. 1971) § 56, pp. 339-340; Rest.2d Torts (1965) § 314A, coms. a, b.) As the Restatement suggests, the law appears to be heading toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence. (*Id.,* com. b; see also Fleming, Law of Torts (4th ed. 1971) p. 143.)" (*Mann* v. *State of California, supra,* 70 Cal.App.3d 773, 779-780; see also, 3 Harper et al., The Law of Torts, *supra,* § 18.6, p. 712 et seq., and numerous authorities there cited; Weinrib, *The Case for a Duty to Rescue, supra,* 90 Yale L.J. 247; Shapo, The Duty to Act: Tort Law, Power and Public Policy (1977); Minor, *The Moral Obligation as a Basis of Liability,* 9 Va. L.Rev. 420 (1923); Ames, *Law and Morals* (1908) 22 Harv. L.Rev. 97; Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability, supra,* 56 U. Pa. L.Rev. 217.)

There are situations, I readily concede, in which application of the special relationship doctrine might inappropriately punish a Good Samaritan and have adverse social consequences; but this is not such a case. The evidence relied upon by the trier of fact shows that the police intervention here significantly increased the risk of harm, not just to respondents and the decedent, but as well as to the police themselves and any others who may have been on or near the scene. The imposition of liability in these circumstances is not at all inappropriate; on the contrary, it is entirely consistent with the many cases, some of which have been decided by the Supreme Court, exposing the police to tort liability for negligent and intentional acts committed in the course of law enforcement activities. (See, e.g., *Munoz* v. *Olin* (1979) 24 Cal.3d 629 [156 Cal.Rptr. 727, 596 P.2d 1143]; *Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575 [86 Cal.Rptr. 465, 468 P.2d 825].)

### D.

Relying on a 1981 opinion from the District of Columbia (*Warren* v. *District of Columbia* (D.C.App. 1981) 444 A.2d 1), the majority in part justifies its refusal to impose a duty in this case on the theory that the duty police officers undertake by virtue of their employment does not relate to any particular individuals but to the public at large. (Maj. opn., *ante,* at pp. 274-275.) In the view of the majority, "[p]ermitting potential suicide victims and their families to hold police officers personally liable for the negligent handling of a suicide crisis conflicts with the public nature of protection services police officers provide to the community at large." (Maj. opn., *ante,* at p. 275.) This justification for the refusal to find a duty does not apply where the police have entered into a "special relationship," and this is true even in the District of Columbia. (See, e.g., *Rieser* v. *District of Columbia*

(D.C. Cir. 1977) 563 F.2d 462, 477-479 [183 App.D.C. 375].) Furthermore, the supposed conflict between the broad interest in public safety and the interest in preserving the life of a particular person does not exist, because the two goals are entirely compatible, and were in fact reconciled in this case by the trier of fact. This is one of the reasons the use of the public nature of law enforcement responsibilities to bar the imposition of liability has been widely criticized. As stated in a leading treatise: "It is frequently said that liability turns on a distinction between the police officer's (or agency's) 'general' or 'public' duties to prevent crime, for the breach of which there is no liability, and the officer's 'special' duty owed to an individual, or a 'special relationship' with the crime victim. The distinction is quite unsatisfactory in terms of normal negligence theory. Some police decisions may deserve immunity as being nontortious because they require choices none of which is objectively unreasonable in the circumstances. Some may be treated as unsuitable for judicial review because adjudication would involve a court in unseemly interference with executive or legislative decisionmaking, e.g., the allocation of a municipality's budget. There is also an understandable reluctance to subject municipalities to wholesale liability in negligence to all crime victims on generalized charges of insufficiency of care in law enforcement. *But run-of-the-mill negligence in the conduct of routine activities should never be insulated from liability by the doubt that an actor owes a 'duty' of care to identifiable persons who will foreseeably be subjected, by such negligence, to unreasonable risk of bodily injury.*" (5 Harper et al., The Law of Torts, *supra*, § 29.6A, pp. 640-641, fns. omitted, italics added.)

The imposition of liability in this case would create none of the problems just described. As the jury explicitly found, the police made a choice that was not only objectively unreasonable in the circumstances but in violation of their own rules.

### E.

The majority also endeavors to undermine the special relationship doctrine by creating a false conflict between that doctrine and *Rowland* v. *Christian, supra,* 69 Cal.2d 108, and using this as the excuse to virtually do away with the special relationship doctrine as it applies to law enforcement officers. According to the majority, "if a duty of care were imposed in each case where there was some progressive, increased chance of injury stemming from a preexisting harm, the special relationship doctrine would be in irremediable conflict with the traditional duty analysis derived from *Rowland* . . . ." (Maj. opn., *ante*, at p. 285.) This is so, the majority reasons, because "[i]n volatile situations, one can always argue that the arrival of police officers caused an incremental increase in tension at the scene, and thus increased the risk of injury occurring." (Maj. opn., *ante*, at p. 284.)

In order to solve this putative problem, the majority creates a new rule: "Where police conduct results in some increase in a preexisting risk of harm, but an analysis of the traditional *Rowland* factors weighs against the imposition of a duty, we conclude that no special relationship duty may be imposed." (Maj. opn., *ante,* at p. 285.)

Summoning higher authority for this emasculation of the special relationship doctrine, the majority claims that "[t]o expansively construe the special relationship doctrine to encompass such incremental increases in a preexisting risk would eviscerate our Supreme Court's adoption in *Williams, supra,* 34 Cal.3d [18, 23,] of the public duty rule, that protects police officers from the burden of assuming greater obligations to others by virtue of their employment." (Maj. opn., *ante,* at p. 285.) The majority mischaracterizes *Williams,* which, as earlier explained, articulates a much more balanced view than the majority implies. The court made it clear in that case that "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, *it is held to the same standard of care as a private person or organization.*" (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 24, italics added, citing *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6, 10 [120 Cal.Rptr. 5]; and *Mann* v. *State of California, supra,* 70 Cal.App.3d at p. 780.) Elsewhere in *Williams* the court reiterated that while a law enforcement officer does not assume any *greater* obligation to others individually, " '[a] *person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people . . . .*' " (34 Cal.3d at p. 24, fn. 3, italics added, quoting *Warren* v. *District of Columbia, supra,* 444 A.2d 1, 4-9.)

What the majority is saying is that the mere appearance of the police on the scene necessarily involves some ("incremental") increase in the risk of harm ("or increased *chance* of injury"), and that it would be irrational to hold the police liable merely for appearing on the scene. The problem the majority sets out to solve does not exist. And the proof it does not exist is provided by the very cases the majority relies upon. (*Williams* v. *State of California, supra,* 34 Cal.3d 18; *M.B.* v. *City of San Diego, supra,* 233 Cal.App.3d 699; *Lopez* v. *City of San Diego, supra,* 190 Cal.App.3d 678; *Von Batsch* v. *American Dist. Telegraph Co., supra,* 175 Cal.App.3d 1111; *Rose* v. *County of Plumas* (1984) 152 Cal.App.3d 999 [199 Cal.Rptr. 842]; *Shelton* v. *City of Westminster, supra,* 138 Cal.App.3d 610; *Clemente* v. *State of California, supra,* 101 Cal.App.3d 374.) In all of those cases, as in many others, the police were relieved of any legal duty precisely because their involvement—which almost always consisted of more than mere appearance on the scene—nevertheless did not rise to the level of "affirmative action

which contributed to, increased, or changed the risk which have otherwise existed." (*Williams, supra,* at p. 27; *Rose, supra,* at p. 1005; accord, *Von Batsch, supra,* at p. 1124; see also *Lopez, supra,* 190 Cal.App.3d at pp. 682-683 [finding "inaction" is not misfeasance] and *Shelton* v. *City of Westminster, supra,* at p. 622 [no duty arises from police undertaking to investigate and take appropriate action to find missing person].)

As I have sought to emphasize, unlike *Williams, Shelton, M.B., Lopez, Von Batsch, Rose, Clemente* and virtually all the other cases the majority relies upon, the conduct complained of in the present case constitutes affirmative action which substantially (not "incrementally") increased the danger that already existed and also created a new danger, which in fact materialized.

*Rowland* v. *Christian* appeals to my colleagues because, by inviting consideration of the "consequences to the community of imposing a duty to exercise care with resulting liability for breach" (69 Cal.2d at p. 113), it permits them to decide this case on the basis of value judgments—specifically, their view that, because the police did not "plan[] to precipitate Patrick's suicide" nor act "with bad faith or a reckless indifference to the consequences of their actions," there was "no moral blame" attendant to their conduct (maj. opn., *ante,* at pp. 270-271)—and to effectuate their belief that the imposition of liability would have a chilling effect on police activities generally. The chief reason I believe *Rowland* is irrelevant to the question of duty in this case, as I have said, is that the police, like everyone else, have no duty to rescue. The issue in this case is whether there is any applicable exception to a general no-duty rule, which is unrelated to the question presented in cases to which *Rowland* properly applies.[10] But there is another important reason why *Rowland* does not and should not apply to determine whether a general duty applies in cases such as this.

---

[10]My belief that *Rowland* v. *Christian* does not apply to this case should not suggest I think it would justify a different result if it did apply. The easiest way to illustrate the point is to compare this case to *Allen* v. *Toten, supra,* 172 Cal.App.3d 1079, which was (erroneously, in my view) decided under *Rowland,* and is heavily relied upon by the majority.

Unlike the present case, the jury in *Allen* found that the police did *not* use excessive force and were *not* negligent in the manner in which they detained and arrested the husband, and that the police were not the cause of the husband's injuries. (172 Cal.App.3d at p. 1084.) While the jury ruled against the husband and other relatives on their causes of action, it found in favor of the wife solely on her cause of action for emotional distress and awarded her $50,000 in damages. The only issue on appeal in *Allen* was whether the wife sufficiently stated a cause of action against peace officers for their alleged negligent infliction of emotional distress in bringing her to the scene of her husband's threatened suicide. (*Ibid.*) Assuming there was no other basis upon which liability could be predicated, the court simply weighed the factors identified in *Rowland* v. *Christian* in order "to determine whether, as a matter of public policy, liability should be imposed upon peace officers and public entities for bringing a family member to the scene of a police standoff to aid in the surrender of an armed and suicidal relative." (172 Cal.App.3d at p. 1087.) The *Allen* court determined that the interest in saving lives, which might be advanced by bringing a relative to the scene, was

What my colleagues dislike about the special relationship doctrine is that, by looking at conduct, it applies to a police officer the same as it applies to everyone else. Thus the doctrine conforms to the decree of our Legislature that "a public employee is liable for injury caused by his act or omission to the same extent as a private person," unless the Legislature has "otherwise provided by statute." (Gov. Code, § 820, subd. (a).) The policy factors that may be considered under *Rowland*, which are judicially developed, not statutory, cannot be applied so as to relieve only public employees (or a certain type of public employees, such as law enforcement officers) of liability to which similarly situated private persons would still be exposed. As will be discussed later, the Legislature has by statute limited the liability for injury of public entities generally (Gov. Code, §§ 820-822.2), and those engaged in police and correctional activities in particular (Gov. Code, §§ 844-846), through the grant of immunities. Those immunity statutes represent legislative resolution of the often competing policy considerations relating to whether all or certain public entities ought to be held responsible under our tort law to the same extent as others. Instead of deferring to the will of the Legislature with respect to this question my colleagues improperly employ *Rowland* to embark upon an independent policy review as if the Legislature had never spoken, thereby usurping its prerogatives.

If, as my colleagues say, the police must be relieved of a duty to use due care because such a legal responsibility would discourage them from intervening in life-threatening situations of the sort presented in this case, the tort liability of the police would be fundamentally different from that of private persons without regard to whether any governmental immunity applies. This

more important than "the interest of protecting some family members from the emotional trauma of viewing a suicide or wounding." (*Id.*, at p. 1089.) The court concluded that the highest priority was "the physical safety of the community, including [the police] themselves, other citizens, and family members," and that "[d]issuading police, by imposing tort liability if things go awry, from exercising their best judgment in calling a family member to assist in disarming a suicidal person increases the burden on them by eliminating one means for peaceful resolution of a crisis." (*Id.*, at pp. 1089-1090.) The *Allen* court determined that the danger of bringing a family member to the scene was justified, because in any weighing of the competing considerations "preserving physical safety and life must be paramount." (*Id.*, at p. 1090.)

Applied to the very different facts of the present case, the policies considered transcendant in *Allen* justify the opposite result. Not only did the police in this case fail to take the action exonerated in *Allen* (which was among the reasons respondents' experts believed they were negligent), but the action they took endangered not only respondents and the decedent, but the police themselves and anyone else who may have been on or near the scene. Neither the record before us nor the arguments of counsel provide a single policy justification for the gratuitously provocative acts of the police found negligent by the jury, certainly not the preservation of life. The only "policy" advanced by relieving the police of liability in this case is to free them from the ordinary consequences of even gross negligence, which does not protect but endangers life.

is a revolutionary proposition. As earlier noted, our Supreme Court has agreed that a person does not, by becoming a police officer, assume any greater obligation than others, but neither, it has declared, does he " *'insulate himself from any of the basic duties which everyone owes to other people.'* " (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 24, fn. 3, italics added, quoting *Warren* v. *District of Columbia, supra,* 444 A.2d 1, 8.) The general rule in California, at least until now, is that ". . . a law enforcement officer is liable to the same extent as a private individual for lack of due care or [for] an intentional act which results in injury, *unless the officer is protected by a statutory immunity.*" (5 Levy et al., California Torts, *supra,* § 61.10, p. 61-62.6, italics added, citing, inter alia, Gov. Code, § 820 ["Except as otherwise provided by statute . . . a public employee is liable for injury caused by his act or omission to the same extent as a private person."].) The majority has so constricted the legal concept of duty applicable to law enforcement officers as to render statutory immunities almost irrelevant.

The trouble with the majority's new rule is not just that it impermissibly invades the domain of the Legislature but that the underlying policy justification has been explicitly rejected by the California Supreme Court. Considering the question in the context of immunity, the issue to which I now turn, our high court has determined that subjecting law enforcement officers to liability for injury caused by their negligent acts will not, as my colleagues claim, inhibit them from providing assistance or unduly burden local government.

## II.

Because it shares my colleagues' concern about the adverse consequences of subjecting law enforcement officers to unlimited tort liability, the Legislature immunized certain specific police and correctional activities from liability. Thus, for example, neither a public entity nor a public employee is liable "for failure to provide sufficient police protection service" (Gov. Code, § 845) or "for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody." (Gov. Code, § 846.) The police are additionally protected by statutory immunities generally applicable to public entities and their employees, including immunity for discretionary acts (Gov. Code, §§ 820.2, 815.2, subd. (b)) and for failure to enforce the law (Gov. Code, § 818.2, 821), as well immunities applicable to particular functions, such as confining or transporting certain persons. (Gov. Code, §§ 850.8, 856.)

Appellants claim the acts described by the jury in the special interrogatory as "negligent" were immunized from liability under Government Code

section 820.2, which states as follows: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." The most pertinent and authoritative definition of the discretionary acts immunized under this statute was provided in the landmark opinion in *Johnson* v. *State of California, supra,* 69 Cal.2d 782.

In *Johnson,* the Supreme Court reversed a summary judgment for the state in an action for personal injuries sustained by a foster mother who had been attacked by a youth placed in her home for foster care by the California Youth Authority. She claimed Youth Authority employees knew of the youth's homicidal tendencies but failed to provide her warning. Holding that the decision not to give warning was not an immune discretionary act, the court rejected a purely "mechanical" or "literal" approach to defining "discretionary actions," and relied primarily "on policy considerations relevant to the governmental entity's claim of immunity." (69 Cal.2d at p. 789.) The chief policy consideration addressed in *Johnson* is precisely the one elevated by appellants in this case and by the majority; namely, that subjecting law enforcement officials to tort liability for negligent acts will inhibit them from providing any assistance at all. The Supreme Court resoundingly rejected this argument, stating that "[t]*he danger that public employees will be insufficiently zealous in their official duties does not serve as a basis for immunity in California." (Id.,* at p. 790, italics in original.)

The Supreme Court commenced its analysis by adverting to Judge Learned Hand's classic articulation of the justification for attaching immunity to "discretionary" actions of public officials in order to protect them from the spectre of extensive tort liability: " 'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.' " *(Id.,* at p. 790, quoting *Gregoire* v. *Biddle* (2d Cir. 1949) 177 F.2d 579, 581.) Our Supreme Court was unpersuaded by this concern for several reasons, explaining at considerable length why "California's statutory provisions for indemnification of public officials largely remove the dangers that troubled Judge Hand and that any

concern for the preservation of ardor in the performance of public duties need not constitute a substantial consideration in our definition of 'discretionary' action." (69 Cal.2d at pp. 790-791.)

Nor did our Supreme Court deem an employee's concern over the potential liability of his or her employer a sufficient reason to expansively define "discretionary," and hence immune, acts. The court felt it "unlikely that the possibility of government liability will be a serious deterrent to the fearless exercise of judgment by the employee." (69 Cal.2d at p. 792, citing Note, *The Discretionary Function Exception of the Federal Tort Claims Act* (1953) 66 Harv. L.Rev. 488, 495-496.) This statement of our Supreme Court cannot be reconciled with the majority's belief "that the risk of liability will affect police conduct regardless of whether an adverse judgment is covered by insurance" (maj. opn., *ante*, at p. 274) and that "[o]nly the most irresponsible police officers would shrug off the possibility of a judgment holding them personally liable for another's suicide solely because monetary damages would not be coming out of their own pocket." (*Ibid.*)

Nor can the majority opinion be squared with the statement in *Johnson* that, "to the extent that [public employees are deterred by the imposition of liability], it may be wholesome. An employee in a private enterprise naturally gives some consideration to the potential liability of his employer, and this attention unquestionably promotes careful work; the potential liability of a government entity, to the extent that it affects primary conduct at all, will similarly influence public employees."[11] (69 Cal.2d at pp. 792-793, fn. omitted, citing James, *Tort Liability of Governmental Units and Their Officers* (1955) 22 U. Chi. L.Rev. 610, 652; Peck, *The Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception* (1956) 31 Wash. L.Rev. 207, 224.)

The foregoing considerations were not the only reasons the Supreme Court imposed liability in *Johnson*. As the court explained, Government Code section 820.2 was designed to assure judicial abstention only "in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government. Any wider judicial review, we believe, would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government. Moreover, the potentiality of such review might even in the first instance

---

[11]One of the strangest observations in the majority opinion is that the "imposition of a tort duty on public safety officers engaged in disarming suicidal persons is certainly likely to result in a more tentative police response to such crises." (Maj. opn., *ante*, at p. 272.) I wholly agree with this statement and am at a complete loss to understand why the majority (which grudgingly concedes (maj. opn., *ante*, at p. 270) that appellants could have responded to the situation "in a less confrontational manner") believes that result would not be salutary.

affect the coordinate body's decision-making process. [Citations.]" (69 Cal.2d at p. 793, italics in original; accord, *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 445 ["section 820.2 affords immunity only for '*basic* policy decisions.' (Italics added.) [Citations.]."]) With this guidepost in mind, the court found "no plausible reason for governmental immunity" in the situation presented in *Johnson.* (69 Cal.2d at p. 795.) The court found that the decision of Youth Authority employees to parole a youth to a given foster family was within the "discretionary function" language of section 820.2. "The decision to parole thus comprises the resolution of policy considerations, entrusted by statute to a coordinate branch of government, that compels immunity from judicial reconsideration." (69 Cal.2d at p. 795, fn. omitted.) "Once an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity; to the extent that a parole officer consciously considers pros and cons in deciding what information, if any, should be given, he makes such a determination at the lowest, ministerial rung of official action. Judicial abstinence from ruling upon whether negligence contributed to this decision would therefore be unjustified; coupled with the administrative laxness that caused the loss in the first instance, it would only result in the failure of governmental institutions to serve the injured individual." (69 Cal.2d at pp. 795-796.)

A police decision to assist in avoiding a potential suicide, like the Youth Authority decision to parole, "comprises the resolution of policy considerations, entrusted by statute to a coordinate branch of government, that compels immunity from judicial reexamination." (69 Cal.2d at p. 795, fn. omitted.) But the decision to provide such public assistance is not at issue in this case. The decisions of the police at issue here, like the Youth Authority decision at issue in *Johnson,* were made *after* the police decided to assist and relate instead to the nature of the assistance provided. We are therefore not here concerned with the basic policy decision to assist in life-threatening situations involving a potential suicide, but the *implementation* of that policy. Moreover, the evidence shows that the decisions made by the police on the scene after they intervened violated the declared policy of the Fremont Police Department regarding the treatment of mentally distressed persons who threaten their own lives or those of others. The conduct which violated that policy is therefore not within the immunity for discretionary acts granted under Government Code section 820.2. As the Supreme Court reiterated in *Johnson,* " '[O]nce the determination has been made that a service will be furnished and the service is undertaken, then public policy demands (except when the Legislature specifically decrees otherwise) that government be held to the same standard of care the law requires of its private*

*citizens in the performance of duties imposed by law or assumed.'* " (69 Cal.2d at p. 796, italics added, quoting *Sava* v. *Fuller* (1967) 249 Cal.App.2d 281, 290 [57 Cal.Rptr. 312]; accord, *McCorkle* v. *City of Los Angeles, supra,* 70 Cal.2d 252 at p. 261.)

The inapplicability to this case of any statutory immunity is underscored by the existence of a special relationship between respondents and the police who responded to their call for assistance. As a leading treatise states, "when police officers are negligent in the performance of a duty which they have undertaken, and *when there exists a special relationship between the public entity and plaintiff in which the public entity has voluntarily assumed a duty of police protection toward plaintiff, liability may be imposed irrespective of the immunity granted by Government Code section 845* [providing immunity for failure to provide sufficient police protective services]. Generally, immunity for failure to provide police protection does not apply to situations in which liability of the public entity is based *not on its failure to provide police services, but rather on its breach of an affirmative duty to protect plaintiff.*" (5 Levy et al., California Torts, *supra,* § 61.13 at pp. 61-70 to 61-71, fns. omitted, italics added, citing, inter alia, *Wallace* v. *City of Los Angeles, supra,* 12 Cal.App.4th 1385, 1402-1403; *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923, 934-935 [281 Cal.Rptr. 500]; *Hartzler* v. *City of San Jose, supra,* 46 Cal.App.3d 6, 9-10; *Hernandez* v. *Southern California Rapid Transit Dist.* (1983) 142 Cal.App.3d 1063, 1067 [191 Cal.Rptr. 436]; see *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792-793 [221 Cal.Rptr. 840, 710 P.2d 907].)

For the foregoing reasons, the police conduct challenged in this case is not within the immunity afforded discretionary acts under Government Code section 820.2.

## III.

Appellants finally maintain that, as a matter of law, the evidence does not establish the requirements for recovery of damages based on negligent infliction of emotional distress because respondents did not directly observe the shooting of Patrick. The several theories they advance all rest on *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], in which the Supreme Court revisited its landmark decision in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], concerning bystander recovery for damages for emotional distress. Appellants emphasize the language in *Thing* limiting recovery to situations in which, among other things, the ·plaintiff "is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing

injury to the victim." (*Thing* v. *La Chusa, supra*, 48 Cal.3d at p. 668.) Recovery for emotional distress is barred in this case, appellants maintain, because, as in *Thing*, respondents did not "contemporaneously witness" the conduct found to be negligent. According to appellants, "mere auditory perception" is insufficient. This is not an impressive argument.

First, no case called to our attention by appellants declares that the contemporaneous awareness requirement of *Thing* can only be satisfied when a plaintiff has visually witnessed the infliction of injury. The plaintiff's problem in *Thing* was not that she did not "observe" the event, but that, in addition, she "was not aware that her son was being injured." (48 Cal.3d at p. 669.)

"Awareness" can occur in a variety of sensory ways, not just visually. The case law provides many illustrations. *Wilks* v. *Hom* (1992) 2 Cal.App.4th 1264 [3 Cal.Rptr.2d 803], for example, was an action by multiple plaintiffs, including the mother of an injured minor, for wrongful death and personal injuries against landlords of a residence where an explosion occurred. The jury awarded damages to the mother for the emotional distress occasioned by the negligently caused injuries to her daughter. At the time of the explosion and injury, the mother and daughter were in different parts of the residence. The Court of Appeal determined that such damages were appropriate "because the mother was contemporaneously aware that the explosion was causing the injuries *although she did not actually see or hear her daughter being injured.*" (*Id.*, at p. 1267, italics added.) The *Wilks* court justified this conclusion in part because the court in *Thing* pointed with approval to its earlier opinion in *Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], holding that "the plaintiff need not visually perceive the third party injury in order to satisfy the *Dillon* guideline, suggesting only that he must suffer shock from ' " 'the sensory and contemporaneous observance of the accident . . . .' " ' " (2 Cal.App.4th at p. 1269, quoting *Thing* v. *La Chusa, supra*, 48 Cal.3d at p. 656, quoting *Krouse* v. *Graham, supra*, 19 Cal.3d at p. 76.)

"In *Krouse*, the plaintiff sat in the driver's seat of his car and knew that his wife was at the curb closing the door to the backseat when a car negligently driven by the defendant approached the rear of the plaintiff's car, straddled the curb and hit and killed the plaintiff's wife. The *Krouse* court ruled it was sufficient that the plaintiff knew his wife's position an instant before she was struck, saw the defendant's car coming toward her at high speed, and knew it must have hit his wife." (2 Cal.App.4th at pp. 1269-1270.) The *Wilks* court concluded, and I agree, that the discussion of *Krouse* in *Thing* affirms "that bystander damages may be recovered only by a plaintiff who is present at the

injury-producing event at the time it occurs and is then aware that it is causing injury to the victim. *The court's analysis did not indicate disapproval, however, of the holding in Krouse that the plaintiff need not visually perceive the injury while it is being inflicted." (Id.,* at p. 1271, italics added.) All that *Thing* sought to make clear was that a plaintiff who arrived at the scene *after* the accident and *neither* saw *nor* heard the event that produced the injury, and was therefore not contemporaneously aware of it, cannot recover damages for emotional distress. That is not what happened in this case.[12]

Respondents were on the scene from the beginning and aware of all material events as they unfolded. They witnessed numerous officers search for Patrick in the house and enter the backyard accompanied by a trained dog and with shotguns and automatic weapons drawn. They were advised that the police had located Patrick under the bush in the rear of the house, and heard repeatedly shouted orders directing him to come out. Respondents were acutely aware of the risks created by the aggressive acts of the police. Respondent Gina Gohlston was so frightened by developments that, shortly before the police discharged their weapons, she sat down on a curb and vomited. Respondent Adams, Patrick's wife, then ran toward the house but was stopped by officers. Moments later respondents heard a final shout from the rear of the house and then a barrage of 34 gunshots. A few moments later respondents saw Patrick carried to an ambulance on a stretcher. Clearly, respondents were "present at the scene" of the injury-producing event, within the meaning of *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, and its progeny.

Appellants also maintain there can be no recovery for emotional distress because the special interrogatory did not specifically identify the discharge of weapons as negligent; therefore, appellants argue, any distress respondents may have suffered from hearing the fusillade was not negligently inflicted and cannot support the award of damages. This contention ignores many references in the special interrogatory to police conduct which inferentially included the use and discharge of weapons, such as the lack of

---

[12]The cases relied upon by appellants are factually distinguishable because all involved situations in which, at the time of the injury-producing event, the plaintiffs were either not physically present or were then completely unaware of any danger to a family member. (See *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]; *Johnson* v. *County of Ventura* (1994) 29 Cal.App.4th 1400 [35 Cal.Rptr.2d 150]; *Evan F.* v. *Hughson United Methodist Church* (1992) 8 Cal.App.4th 828 [10 Cal.Rptr.2d 748]; *Fife* v. *Astenius* (1991) 232 Cal.App.3d 1090 [284 Cal.Rptr. 16]; *Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270]; *Wright* v. *City of Los Angeles* (1990) 219 Cal.App.3d 318 [268 Cal.Rptr. 309]; *Ebarb* v. *Woodbridge Park Assn.* (1985) 164 Cal.App.3d 781 [210 Cal.Rptr. 751]; *Jansen* v. *Children's Hospital Medical Center* (1973) 31 Cal.App.3d 22 [106 Cal.Rptr. 883].)

control, violation of police procedures, the use of armed officers, which the jury felt left no option but force, and the "assault" mode of the police response to the call for assistance. Furthermore, appellants overlook the considerable expert testimony that the police were negligent in using and discharging weapons, which this court cannot ignore.

## IV.

Relying on *Elden* v. *Sheldon* (1988) 46 Cal.3d 267 [250 Cal.Rptr. 254, 758 P.2d 582], which holds that an action for negligent infliction of emotional distress cannot be maintained by an unmarried cohabitant of the injured party, appellants argue that respondent Gohlston cannot recover damages for emotional distress because, as Patrick's stepdaughter, she was too distantly related. Appellants initially raised this issue in a pretrial motion to dismiss respondent Gohlston's action. In response, this respondent filed a lengthy declaration, which has never been disputed, describing the extremely close and loving relationship she had with her stepfather. The motion was denied after the trial court specifically found that respondent Gohlston was not too distantly related to Patrick to be able to maintain an action for negligent infliction of emotional distress.[13] There is no basis upon which this court could set aside that factual finding, as the evidence of a close relationship is undisputed and no court has ever declared as a matter of law that for purposes of determining whether a plaintiff may maintain an action for negligent infliction of emotional distress a stepchild must be treated differently than any other child.

## V.

Appellants' final contention regarding the claim for negligent infliction of emotional distress is that it should not be allowed at all because respondents failed to satisfy the claim-filing requirement of Government Code section 945.4. The argument fails. First, as respondents point out, their claims specifically sought damages for emotional distress as well as punitive damages, which cannot be recovered in an action that is merely for wrongful death. (*Krouse* v. *Graham, supra*, 19 Cal.3d 59, 72 [emotional distress]; *Parker* v. *Superior Court* (1985) 175 Cal.App.3d 1082, 1087 [223 Cal.Rptr. 292] [punitive damages].) Appellants were therefore well aware respondents

---

[13]The Supreme Court noted in *Thing* v. *La Chusa*, that "[i]n most cases no justification exists for permitting recovery for NIED [(negligent infliction of emotional distress)] by persons who are only distantly related to the injured victim. Absent exceptional circumstances, recovery should be limited to relatives residing in the household, or parents, siblings, children, and grandparents of the victim." (48 Cal.3d at p. 668, fn. 10.) In the present case, the trial court apparently determined that the stepdaughter, Gina Gohlston, was not too "distantly related" to Patrick and that the necessary "exceptional circumstances" were present.

intended to sue for more than just wrongful death, or should have been. Respondents' claims provided sufficient information enabling appellants to adequately investigate the claim and settle the matter, if possible, without the expense of litigation, which is the purpose of the claims-filing requirement. (*Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699, 705 [263 Cal.Rptr. 119, 780 P.2d 349].) Indeed, the trial court made such a finding. Furthermore, appellants conceded below that the reason they did not settle this case was not because they were inadequately advised of the nature of respondents' claims, but because they did not believe they breached any legal duty. Finally, if appellants believed respondents' claims were unclear in any particular—and it is difficult to believe there ever was any such uncertainty—they were statutorily obliged to file a notice of insufficiency, "stating with particularity the defects or omissions" of the claim presented. (Gov. Code, § 910.8.) By failing to provide such notice, appellants waived the defense that the claim was defective. (Gov. Code, § 911; *Phillips* v. *Desert Hospital Dist., supra*, 49 Cal.3d at p. 711.)

For the foregoing reasons, I would affirm the judgment.

A petition for a rehearing was denied January 4, 1999, and the opinion was modified to read as printed above. Kline, P. J., was of the opinion that the petition should be granted. The petition of plaintiffs and respondents for review by the Supreme Court was denied March 24, 1999. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.